Paul H. ROBINSON, Clifford Owens, Paul B. Kelly, Allan Roth, Calvin W. Corman, Earl Maltz, Elihu Abrahams, Arnold Glass, Charles W. Uptom, Alex W. Wypyszinski, Michael Crew, Harold Zapolsky and Jackson Toby

v.

STATE OF NEW JERSEY, Thomas H. Kean, Governor, James W. Mastriani, Chairman Public Employment Relations Commission, Edward J. Bloustein, President and Indiv. Rutgers State University, Rutgers University, Board of Governors, Rutgers University, State Dept. of Higher Education, Mr. James A. Gormley, Director of Personnel and Indiv., Rutgers University (Camden), Christine Mowry, Director of Office of Employee Labor Relations and Indiv., Rutgers Council, AAUP and Ms. Sandra Walther, Executive Director Rutgers Council, American Association, Richard Laity, Chairman and Indiv., AAUP Legislative Relations Committee, AAUP and Irvin J. Spitzberg, Jr., General Secretary AAUP, Richard Peskin, President and Indiv., Rutgers Council of AAUP.

Joseph W. ANTONACCI, Meveril Jones, Thomas Gay, John Russell, Richard H. Trexler, A. William Onder, Leon Matelski, Edward Jakubco, Mrs. Dorothy Gray and William F. Gray

v.

STATE OF NEW JERSEY, Thomas H. Kean, Governor, James W. Mastriani, Chairman, Public Employment Relations Commission, Westfield Education Association, Sally Vejnoska, President and Indiv., Union County Education Association, Westfield Board of Education, Dr. L.J. Greene, Superintendent and Indiv., Robert Westkerna, Pascack Valley Regional Education Association, David T. Dierker, President and Indiv., Bergen County Education Association, Pascack Valley Regional Board of Education, Laurie Thorton, President and Indiv., Edison Township Board of Education, Aurora Bernard-Salit, President and Indiv., Middle Sex County Educa-

tion Association, Maria Versocki, President and Indiv., Edison Township Board of Education, Charles A. Boyle, Superintendent, Ridgewood Education Association, Frank Sidoti, President and Indiv., Ridgewood Board of Education, Rosemarie Schutt, President and Indiv., Township of Ocean Board of Education, James F. Jeffries, President and Indiv., New Jersey Education Association, Edith Fulton, President and Indiv., National Education Association, Willard H. McGuire, President.

Allen OLSEN, William Anderson, Peter Yull, Larry Land, Fred S. Smartt, and William J. Harrington

v.

COMMUNICATIONS WORKERS OF AMERICA (CWA), Glenn E. Watts, CWA District One CWA Locals, 1031, 1032, 1033, 1034, 1037, 1038, 1040 and State of New Jersey, Thomas H. Kean, Governor.

Appeal of WESTFIELD EDUCATION ASSOCIATION, Sally Vejnoska, Union County Education Association, Pascack Valley Regional Education Association, Robert Westkerna, David T. Dierker, Bergen County Education Association, Edison Township Board of Education, Aurora Bernard-Salit, Middlesex County Education Association, Maria Versocki, Ridgewood Education Association, Frank Sidoti, Township of Ocean Board of Education, Elizabeth Campanile, New Jersey Education Association, Edith Fulton, National Education Association, and Willard H. McGuire, in Nos. 82–5698 and 83–5533.

Appeal of Joseph W. ANTONACCI, et al., in No. 82–5750.

Appeal of RUTGERS COUNCIL OF AAUP CHAPTERS, Sandra Walther, Richard Peskin and Richard Laity, in No. 83–5569.

Appeal of NATIONAL AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS and Irving J. Spitzberg, Jr., in No. 83–5563.

Appeal of Allen OLSEN, William Anderson, Peter Yull, Larry Land, Fred S. Smartt, and William J. Harrington, in No. 83–5459.

Appeal of COMMUNICATIONS WORKERS OF AMERICA, AFL–CIO, in Nos. 83–5403 and 83–5532.

Nos. 82–5698, 82–5750, 83–5403, 83–5459, 83–5532, 83–5533, 83–5563, 83–5569.

United States Court of Appeals, Third Circuit.

Argued Feb. 27, 1984.

Decided Aug. 6, 1984.

Rehearing and Rehearing In Banc Denied Sept. 11, 1984.

Jeffry A. Mintz (argued), Stein & Shapiro, Cherry Hill, N.J., Nelson R. Kieff (Argued), National Right to Work Legal, Defense Foundation, Inc., Springfield, Va., for Paul H. Robinson, et al.

Edward F. Ryan, Carpenter, Bennett & Morrissey, Newark, N.J., for Rutgers, The State University of N.J.

Laurence Gold (Argued), James B. Coppess, Washington, D.C., for Communication Workers of America; Steven P. Weissman, Trenton, N.J., of counsel.

Robert H. Chanin (Argued), David M. Silberman, James J. Brudney, Bredhoff & Kaiser, Washington, D.C., Cassel R. Ruhlman, Jr., Ruhlman & Butrym, Pennington, N.J., for Westfield Educ. Ass'n, et al.

Paul Schachter (Argued), Reinhardt & Schachter, P.C., Newark, N.J., for Rutgers Council for AAUP, Walther, Peskin & Laity.

Alfred E. Ramey, Jr., Deputy Atty. Gen., State of N.J., Trenton, N.J., for State of N.J.

Ann Franke (Argued), Lawrence White, Washington, D.C., for American Ass'n of University Professors; Ralph S. Spritzer,

Philadelphia, Pa., Ralph S. Brown, New Haven, Ct., of counsel.

Robert E. Anderson, Jr., Gen. Counsel, Public Employment Relations Com'n, Trenton, N.J., for James W. Mastriani.

Amy H. Rudolph, Sauer, Boyle, Dwyer & Canellis, Westfield, N.J., Jan Schlesinger, Hartman, Schlesinger, Schlosser, Faxon & Foy, Mount Holly, N.J., amicus curiae.

Before ADAMS, SLOVITER, Circuit Judges, and TEITELBAUM, District Judge.*

## OPINION OF THE COURT

ADAMS, Circuit Judge.

These consolidated appeals present two important questions posed by the representation fee arrangements created under the New Jersey public employee statute:[1] first, the permissibility under the First Amendment of the use of mandatory representation fees for lobbying activities by public employee unions; and, second, the extent of due process protections afforded to employees who object to the use of any portion of their fees to further the political and ideological stands of their bargaining representative.

---

* Hon. Hubert I. Teitelbaum, United States District Court for the Western District of Pennsylvania, sitting by designation.

1. A representation fee denotes the mandatory contribution of a non-union employee to the bargaining representative in his or her workplace. Representation fees, also termed agency fees or a fair share, are assessed to help defray the costs of the union's negotiation and administration of the collective bargaining contract, handling of grievances, and other responsibilities under a collective bargaining agreement. Under typical representation fee or agency fee arrangements, employees may elect to join the union selected by the majority of employees in an appropriate unit or pay a fee for services without agreeing to actual union membership. See K. Hanslowe, D. Dunn, & J. Erstling, Union Security in Public Employment: Of Free Riding and Free Association 4 (1978).

The present consolidated appeals were held under advisement by this Court pending the Supreme Court's resolution of several agency fee issues in Ellis v. Railway Clerks, —— U.S. ——, 104 S.Ct. 1883, 80 L.Ed.2d 428 (1984).

---

The district court determined that the use of mandatory representation fees for lobbying activities by public employee unions was in conflict with the First Amendment of the United States Constitution and that the various escrow account procedures advanced by the defendant-unions were insufficient to protect the constitutional rights of non-consenting employees. Consequently, the district court enjoined the operation of the representation fee provision of the New Jersey Act and ordered that no fees be deducted from the salary of non-consenting employees. For the reasons developed below, we reverse the judgment of the district court, direct that the injunctions be withdrawn, and order that the matter be remanded for further proceedings.

## I.

In 1968, the New Jersey Employer-Employee Relations Act granted state public employees the right to bargain collectively with the state employer. N.J.S.A. 34:13A–5.1 et seq.[2] A prime purpose of the Act was to promote the state's interest in the settlement of labor disputes and the prevention of work stoppages through negotiations between the state employer and a collective bargaining representative selected by the majority of employees.[3] See

---

2. Under the National Labor Relations Act, the regulation of state employee labor relations is left to the individual states. 29 U.S.C. § 152(2) (1982).

3. The declaration of policy contained in N.J. S.A. 34:13A–2 is premised on similar statements of policy in the NLRA and the Railway Labor Act, 45 U.S.C. §§ 151 et seq. (1976). The New Jersey Act provides:

It is hereby declared as the public policy of this State that the best interests of the people of the State are served by the prevention or prompt settlement of labor disputes, both in the private and public sectors; that strikes, lockouts, work stoppages and other forms of employer and employee strife, regardless where the merits of the controversy lie, are forces productive ultimately of economic and public waste; that the interests and rights of the consumers and the people of the State, while not direct parties thereto, should always be considered, respected and protected; and that the voluntary mediation of such public and private employer-employee disputes un-

*Caldwell-West Caldwell Ed. Ass'n v. Caldwell-West Bd. of Educ.*, 180 N.J.Super. 440, 435 A.2d 562, 567 (App.Div.1981). Under the terms of the Act, a public employee union may collect dues from those employees who choose to join the union; all other members of a bargaining unit are free not to contribute to the union's expenses in any form. Nevertheless, the Act

> require[s] that a majority representative of public employees which has negotiated a labor agreement covering such employees to represent the interests of *all* employees in the bargaining unit, regardless of organizational membership, without discrimination. Non-members of the majority organization, therefore, enjoy virtually equal benefits and protections without sharing in the costs, incurred by collective negotiations, grievance representation, and other services.

Sponsor's Statement to Assembly Bill No. 688, February 9, 1978, quoted in *Robinson v. State of New Jersey*, 547 F.Supp. 1297, 1301 (D.N.J.1982); *see* N.J.S.A. 34:13A–5.3 ("majority representative ... shall be responsible for representing the interest of all such employees").

This "free rider" problem was remedied by legislation in 1980.[4] The New Jersey statute was amended to allow a majority bargaining representative to collect a representation fee from all employees within an appropriate bargaining unit who had not joined the union. N.J.S.A. 34:13A–5.5(b) directed that the representation fee

> shall be in an amount equivalent to the regular membership dues, initiation fees and assessments charged by the majority representative to its own members less the cost of benefits financed through the dues, fees and assessments and available only to its members, but in no event shall such fee exceed 85% of the regular membership dues, fees and assessments.

der the guidance and supervision of a governmental agency will tend to promote permanent, public and private employer-employee peace and the health, welfare, comfort and safety of the people of the State. To carry out such policy, the necessity for the enactment of

Under N.J.S.A. 34:13A–5.5(c), unions were empowered to use representation fee funds for

> the costs of support of lobbying activities designed to foster policy goals in collective negotiations and contract administration or to secure for the employees represented advantages in wages, hours, and other conditions of employment in addition to those secured through collective negotiations with the employer.

Section 5.5(c) also requires that any public employee paying a representation fee

> shall have the right to demand and receive from the majority representative ... a return of any part of that fee paid by him which represents the employee's additional pro rata share of expenditures by the majority representative that is either in aid of activities or causes of a partisan political or ideological nature only incidentally related to the terms and conditions of employment or applied to the cost of any other benefits available only to members of the majority representative.

Public employee unions are not allowed to avail themselves of a dues checkoff (the automatic deduction of representation fees from an employee's paycheck by the employer), until they have established the demand and return system required by statute. N.J.S.A. 34:13A–5.5(c). Such a demand and return system must allow for review of the amount returned "through full and fair proceedings placing the burden of proof on the majority representative." N.J.S.A. 34:13A–5.6. Employees dissatisfied with the review proceeding have a right of appeal to a three-member board consisting of a representative of public employers, a representative of public employee organizations, and a neutral member. Further appeals from this board lie to the state courts.

> the provisions of this Act is hereby declared as a matter of legislative determination.

**4.** N.J.P.L. 1979, c. 477, eff. July 1, 1980, N.J.S.A. 34:13A–5.5 to 5.9.

## II.

The consolidated appeals before the Court today involve three separate challenges to the constitutionality of the 1980 amendments brought by individual faculty members at the state-owned and operated Rutgers University, individual teachers employed by five different school boards in New Jersey, and individual employees of the state.[5] The defendants are the State of New Jersey, its governor, the state public employment relations commission (PERC), and various national and regional affiliates of public employee unions.

In *Robinson v. New Jersey*, plaintiffs attack the representative fee paid by all faculty members at Rutgers University to the American Association of University Professors (AAUP). In *Antonacci v. Westfield Education Association*, the challenged majority representative is the National Education Association (NEA) and its New Jersey affiliates. In *Olsen v. Communications Workers of America*, the disputed representation fees are paid to the Communications Workers of America (CWA) as bargaining representative for four units of state employees.

Although the original actions filed in the district court challenged a broad swath of the New Jersey statute, including the authority of the state legislature to require non-consenting employees to pay representation fees, the consolidated appeals focus primarily on the authorization of lobbying by public employee unions and the demand and return systems established by the unions involved in the present appeals. In a joint opinion covering the *Robinson* and *Antonacci* cases, the district court held that "it is permissible to require non-mem-

bers to contribute to the cost of collective bargaining activities." 547 F.Supp. at 1316. The court, however, found that the New Jersey statute went beyond what was constitutionally permissible in allowing the use of representation fees for lobbying activities "designed to foster policy goals in collective negotiations and contract administration." N.J.S.A. 34:13A–5.5. Pointing to the possibility of "very deep political and ideological differences of opinion" regarding the aims of such lobbying, the court concluded:

> Although plaintiffs are teachers and defendants can argue that they might benefit personally from changes in these laws, plaintiffs and other non-members of the employee organizations may nevertheless oppose such legislative changes. They may oppose for political or ideological reasons; they may believe, as do many other citizens, that the legislative changes sought by the employee organizations are bad public policy even though they, as teachers, might receive certain benefits.
>
> ... New Jersey's statute does permit such lobbying, and to that extent it violates plaintiffs' First Amendment rights.

547 F.Supp. at 1317. The district judge entered an injunction prohibiting the unions from using any agency fees in lobbying efforts. The judge also directed that all representation fees be placed in escrow under the supervision of the court until such time as the unions devised a procedure under which the unions, rather than a challenging employee, would have the entire burden of proving that representation fees were not directed toward constitutionally impermissible ends.[6]

---

**5.** Plaintiffs in each case moved for class certification pursuant to Rule 23 of the Federal Rules of Civil Procedure. Class certification was denied by the district court and plaintiffs appeal from this denial. Because we rule that plaintiffs are not entitled to relief under the Constitution in the consolidated appeals, we need not reach the issue of class certification.

**6.** Following the district court's ruling on September 28, 1982, the union-defendants appealed the district court's determination that representation fee proceeds could not be directed

toward collective-bargaining related lobbying. Plaintiffs cross-appealed on the refusal of the district court to enjoin the collection of all representation fees in light of the ruling that the New Jersey statute was constitutionally infirm. The court denied the request for broader injunctive relief for fear this might "injure the collective bargaining process." 547 F.Supp. at 1324. Because of our disposition of the merits of this case, we need not reach the issue presented on cross-appeal whether the failure of the district court to

In March 1983, the district court extended the injunction against the use of representation fees to the CWA locals involved in the *Olsen* suit. Because the CWA had already established a practice of escrowing 40 per cent of the fees during the pendency of the litigation, the district judge did not grant preliminary injunctive relief against the union's collection mechanism. Rather, he consolidated the three proceedings for final determination of the constitutionality of the various demand and return systems.

On June 15, 1983, the district court entered its injunction against the employment of any of the demand and return systems designed by the three defendant unions. The court acknowledged that the CWA system in particular "constituted genuine attempts to create as effective demand and return systems as human ingenuity could devise." 565 F.Supp. 942 at 945. The judge, however, concluded:

> [E]ach system is complex and overwhelmingly burdensome. Each requires an objecting member to expend such major efforts to pursue his remedy that no individual could be expected to avail himself of the remedy. Thus under the very best demand and return system no objecting non-member can devote the time and money required to ascertain and, if warranted, regain the portion of his representation fee which the union may use for political and ideological purposes. The statutory requirement of a demand and return system is an illusory remedy. As a practical matter, therefore, the statute permits a union to take the funds of objecting nonmembers and use them for the union's own political and ideological purposes. The good faith efforts of the union defendants in these cases to create workable systems demonstrate that no demand and return system can protect an objecting non-member's First Amendment rights.

*Id.* at 945–46. The court then issued final injunctive relief to the plaintiffs prohibiting

the collection of any representation fees from objecting employees:

> If plaintiffs' important constitutional rights are to be protected, injunctive relief must be granted at this time.... The injunction as to any plaintiff shall remain in effect until the plaintiff withdraws his objection or until the statute is amended (i) so as to exclude from the representation fee expenses for political, ideological and lobbying activities (other than lobbying to secure approval or implementation of a collective bargaining agreement) and (ii) so as to include a provision for a hearing before a state tribunal on the validity of any representation fee prior to payment of the fee to the union.

*Id.* at 949.

### III.

We begin our analysis by addressing the first of the constitutional challenges to the New Jersey representation fee system, the claim that the lobbying provision infringes the First Amendment rights of non-consenting employees.

### A.

Before we address the issues posed by the lobbying activities of public employee unions, it bears emphasis that the constitutional dimension of compelled employee support for these activities does not arise in a vacuum. All compulsory contributions to unions, whether in the form of the closed or union shop or in the form of representation or agency fees, to some extent implicate the rights of association and free expression protected by the First Amendment. As the Supreme Court has recognized,

> To compel employees financially to support their collective-bargaining representative has an impact upon their First Amendment interests. An employee may very well have ideological objections to a wide variety of activities undertaken

---

enjoin the collection of all representation fees in 1982 was an abuse of discretion. We also do not reach the question whether the court's

subsequent injunction against all representation fee payments mooted the cross-appeal from the 1982 ruling.

by the union in its role as exclusive representative. His moral or religious views about the desirability of abortion may not square with the union's policy in negotiating a medical benefits plan. One individual might disagree with a union policy of negotiating limits on the right to strike, believing that to be the road to serfdom for the working class, while another might have economic or political objections to unionism itself. An employee might object to the union's wage policy because it violates guidelines designed to limit inflation, or might object to the union's seeking a clause in the collective-bargaining agreement proscribing racial discrimination. The examples could be multiplied. To be required to help finance the union as a collective-bargaining agent might well be thought, therefore, to interfere in some way with an employee's freedom to associate for the advancement of idea, or to refrain from doing so, as he sees fit.

*Abood v. Detroit Board of Education*, 431 U.S. 209, 222, 97 S.Ct. 1782, 1792, 52 L.Ed.2d 261 (1977).

■ To recognize the constitutional ramifications of compulsory contributions to unions, however, does no more than set the stage for the judicial inquiry. A constitutional analysis under the First Amendment must also consider the rights of the majority employees to association for the purposes of advancing their interests, *International Association of Machinists v. Street*, 367 U.S. 740, 773, 81 S.Ct. 1784, 1802, 6 L.Ed.2d 1141 (1960), and of the congressional determination that collective bargaining best promotes industrial peace. Thus, in *Abood*, the Court reiterated that "such interference [with individual First Amendment rights] as exists is constitutionally justified by the legislative assessment of the important contribution of the union shop to the system of labor relations established by Congress." 431 U.S. at 222,

97 S.Ct. at 1793. As one commentator has observed:

[T]he most effective technique to produce acceptable terms to resolve disputes is voluntary agreement of the parties, and the best system we have for producing agreement between groups is collective bargaining ....

Kheel, *Strikes and Public Employment*, 67 *Mich.L.Rev.* 931, 942 (1969).

The Supreme Court initially confronted the First Amendment issues in the union shop context in a series of cases brought under the Railway Labor Act. In *Railway Employees Dep't v. Hanson*, 351 U.S. 225, 231, 76 S.Ct. 714, 717, 100 L.Ed. 1112 (1956), the Court took note of Congress' intent that those "who enjoy the fruits and benefits of unions" should contribute to the cost of collective bargaining, and that "the requirement for financial support of the collective-bargaining agency by all who receive the benefits of its work is within the power of Congress under the Commerce Clause and does not violate either the First or Fifth Amendments." *Id.* at 238, 76 S.Ct. at 721.

Beginning with *Street*, however, the Court recognized that certain categories of union expenditures could not properly be taxed against non-consenting employees. Thus, while the Railway Labor Act did not curtail "the traditional political activities of the railroad unions," unions could "not support those activities, against the expressed wishes of a dissenting employee, with his exacted money," even in a closed shop. 367 U.S. at 770, 81 S.Ct. at 1800. The Court concluded that the employees "who have participated in this action have in the course of it made known to their respective unions their objection to the use of their money for the support of political causes. In that circumstance, the respective unions were without power to use payments thereafter tendered by them for such political causes." *Id.* at 771, 81 S.Ct. at 1801.[7]

---

7. *But see Street, supra,* 367 U.S. at 800–804, 812, 81 S.Ct. at 1815–1817, 1821 (Frankfurter, J., dissenting) (challenging majority's reading of legislative history to bar traditional union use of

funds to promote political interests of labor). The distinction drawn in *Street* between general union activities that could be charged to compulsory union fees and political activities that

In *Railway Clerks v. Allen*, 373 U.S. 113, 83 S.Ct. 1158, 10 L.Ed.2d 235 (1963), the Court returned to the question of what funds could not be taxed against non-consenting employees and the remedies that would protect First Amendment rights of those employees. Relying on the Railway Labor Act, the Court distinguished "the union's political expenditures from those germane to collective bargaining, since only the former, to the extent made from exacted funds of dissenters, are not authorized by [the Act]." *Id.* at 121, 83 S.Ct. at 1163. Although the holding rested on a statutory interpretation, the Court intimated that so long as mandatory contributions were used to further activities "germane to collective bargaining," the demands of the First Amendment would be met. The Court suggested that any constitutional deficiencies could be cured by a proportional refund to objecting employees of any funds expended in furtherance of the union's political agenda. *Id.* at 122–23, 83 S.Ct. at 1163–64.

The case law developed under the Railway Labor Act was first applied to public employees in *Abood*. Pursuant to Michigan law, the Detroit Federation of Teachers signed a collective bargaining agreement with the Board of Education that provided for an agency fee shop. D. Louis Abood and other teachers filed suit in state court challenging the authorizing legislation as abridging both state and federal constitutional protections. The Supreme Court upheld the state statute as a permissible exercise of the state's power to regulate labor relations: "[t]he desirability of labor peace is no less important in the public sector, nor is the risk of 'free riders' any smaller." 431 U.S. at 224, 97 S.Ct. at 1974. Applying the trilogy of cases decided under the Railway Act, the Court concluded:

> The very real differences between exclusive agent collective bargaining in the public and private sectors are not such as to work any significant infringement upon the First Amendment interests of public employees. A public employee who believes that a union representing him is urging a course that is unwise as a matter of public policy is not barred from expressing his viewpoint.

*Id.* at 230, 97 S.Ct. at 1796. Simply put, "[t]he differences between public- and private-sector collective bargaining do not translate into differences in First Amendment rights." *Id.* at 232, 97 S.Ct. at 1798.

Having determined the constitutional validity of an agency fee shop in the public sector, the Court narrowed the issue to one of fashioning a guarantee that no employee shall be forced to subsidize the political or ideological positions of a union:

> There will, of course, be difficult problems in drawing lines between collective-bargaining activities, for which contributions may be compelled, and ideological activities unrelated to collective bargaining, for which such compulsion is prohibited. The Court held in *Street* as a matter of statutory construction, that a similar line must be drawn under the Rail-

---

could not has been challenged as unworkable and as having such minimal consequences on any individual employee as to be without constitutional significance. See the discussion in Cantor, Uses and Abuses of the Agency Shop, 49 Notre Dame L.Rev. 62, 70–71 (1983):

> Forced payments to a service organization by all who benefit from the service do not significantly impinge on associational or speech interests, even if the beneficiary organization uses a portion of the extracted fees to support political or ideological causes opposed by some payors. So long as the organization does in fact perform a useful function for the fees payors, and so long as the organization is legally bound to use the funds to promote the related functions and goals of the organiza-

tion, then the disgruntled fees payor cannot complain any more than the taxpayer whose funds are used by the government for programs ideologically offensive to the taxpayor. [Footnotes omitted]

*See also* Cantor, Forced Payments to Service Institutions and Constitutional Interests in Ideological Non-Association, 36 Rutgers L.Rev. 3 (1983–84). There would appear to be a certain irony in the greater scrutiny imposed on union expenditures as a result of the state action nexus than is imposed on actions of the government itself. Cf. *United States v. Lee*, 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982) (upholding constitutionality of requirement that Amish pay social security taxes despite religious objection).

way Labor Act, but in the public sector the line may be somewhat hazier. The process of establishing a written collective-bargaining agreement prescribing the terms and conditions of public employment may require not merely concord at the bargaining table, but subsequent approval by other public authorities; related budgetary and appropriations decisions might be seen as an integral part of the bargaining process. We have no occasion in this case, however, to try to define such a dividing line.

*Id.* at 236, 97 S.Ct. at 1800 (footnote omitted).

It is this task of line drawing we now address.

### B.

This past term, the Supreme Court reaffirmed the "germane to collective bargaining" standard for judging the use of mandatory fees over an employee's objection:

> [T]he test must be whether the challenged expenditures are necessarily or reasonably incurred for the purpose of performing the duties of an exclusive representative of the employees in dealing with the employer on labor-management issues.

*Ellis v. Railway Clerks,* — U.S. —, 104 S.Ct. 1883, 1892, 72 L.Ed.2d 262 (1984). Applied to the issue of lobbying, two possible analytic frameworks are advanced by the litigants. First, we could decide, as plaintiffs urge, that the union may tax representation fee payers only for contract negotiations that occur exclusively at the bargaining table. Second, we could distinguish between union expenditures based upon the subject matter of the expenditure, rather than the forum.

### 1.

There is nothing in the case law governing public employee unionism that mandates the conclusion drawn by the plaintiffs. *Abood* itself recognizes that "[t]he process of establishing a written collective-bargaining agreement prescribing the terms and conditions of public employment

may require not merely concord at the bargaining table but subsequent approval by other public authorities." 431 U.S. at 236, 97 S.Ct. at 1800. Similarly, in a case brought under the NLRA, the Supreme Court defined the statutory "mutual aid or protection" clause under the NLRA to extend to activities in which employees "seek to improve working conditions through resort to administrative and judicial forums" and added that "employees' appeals to legislators to protect their interests as employees are within the scope of this clause." *Eastex, Inc. v. NLRB,* 437 U.S. 556, 566, 98 S.Ct. 2505, 2512–13, 57 L.Ed.2d 428 (1978) (footnote omitted); *see also id.* at 565 n. 13, 98 S.Ct. at 2512 n. 13 (reviewing policy considerations underpinning legislative decision to allow employees to act collectively with regard to terms and conditions of employment and "the welfare of labor generally"). Taken as a whole, the agency fee case law points to a focus on collective bargaining as a process whereby unions must advance the collective interests of their members in a number of arenas. We are therefore unable to conclude that under the First Amendment New Jersey cannot extend the same scope of bargaining powers to public employee unions under a state statute as has been created by Congress under the NLRA.

To decide otherwise would seriously hamper the ability of public employee unions to bargain effectively for the employees they represent. Public employee bargaining is distinctive in that at least a portion of a union's attention is directed away from the bargaining table, even for what would be designated the standard terms and conditions of employment under the NLRA:

> [I]n the private sector, the employer must send someone to the bargaining table with authority to make a binding agreement. In the public sector this may not be legally possible or politically sensible. Wages and other benefits directly affect the budget and the tax rates; but adopting budgets and levying taxes are considered, within our governmental system, fundamental legislative

policies to be decided by the legislative body, not by a negotiator at the bargaining table. Dismissal procedures may be subject to constitutional requirements which limit the procedures which can be negotiated. Promotion policies may be governed by civil service principles which are written into the city charter and cannot be eliminated by bargaining. Modifications in state pension plans cannot, in most states, be made binding by negotiators, but must be ratified by the legislature. In the public sector, agreement at the bargaining table may be only an intermediate, not a final, step in the decisionmaking process.

Summers, *Public Sector Bargaining: Problems of Governmental Decisionmaking,* 44 *U.Cin.L.Rev.* 669, 670–71 (1975).[8]

### 2.

These appeals do not represent the first time that a court has been asked to evaluate the underlying constitutional implications of mandatory contributions to unions. In *Abood* the teacher-plaintiffs contended that the bargaining activity of a public sector union is inherently political and that compulsory financial support of such activity therefore transgresses First Amendment associational rights. This argument

was rejected in *Abood* and again in *Minnesota State Board for Community Colleges v. Knight,* — U.S. ——, 104 S.Ct. 1058, 79 L.Ed.2d 299 (1984). In the latter case, the Court held that, although an agency fee arrangement could bolster the political position of a public employee union, the pressure to support the majority representative's political positions "is inherent in our system of government; it does not create an unconstitutional inhibition on associational freedom." The Court left untouched the reasoning of the three-judge district court in *Knight,* 371 F.Supp. 1, 6 (D.Minn. 1982)[9] that, based upon *Abood,* the "crucial distinction is union political activity *unrelated* to collective bargaining." *Id.*

This Court has also previously discussed the scope of *Abood's* restriction on the forcible underwriting of political and ideological concerns. In a case involving the use of student fees at a state university for purely political lobbying activities, we distinguished *Abood* as restricting only "that portion of the union service fee used for political or ideological purposes *unrelated* to collective bargaining.... [T]o the extent the service fee was used for *purely* political purposes, it could be extracted only from those employees who do not ob-

---

**8.** It is possible to question whether meaningful bargaining can even potentially occur at the bargaining table in the public employment context:

> Collective bargaining in state and local government typically takes place in two steps. First, the employee organization hammers out an agreement with an administrator. Second, they take their agreement to the appropriate legislative body for validation of its economic portions. Occasionally, they lobby jointly for validation. More often, the employee organization "renegotiates" for better terms at the legislative level by partisan lobbying.
>
> The ideal arrangement would centralize management bargaining authority in a single person or administrative body, but legislatures seem to hate giving up power, particularly over the purse-strings; hence the governmental structure tends to encourage the two-step procedure. This discourages meaningful bargaining at the first step.

E. Beal, E. Wickersham & P. Kienast, The Practice of Collective Bargaining 499 (1976). *See generally, id.* at 456–57 (traditional recourse to lobbying by public employee unions); Hilde-

brand, *The Public Sector* in J. Dunlop & N. Chamberlain, eds., Frontiers of Collective Bargaining 129 (1967) (legislative body is ultimate authority for committing a public agency to a collective bargain); M. Lieberman, Public Sector Bargaining 116–221 (1980) (overlap between bargaining over terms and conditions of employment in public sector and statutory regulation of employment; lack of certainty in many jurisdictions over which prevails); H. Wellington & R. Winter, The Unions and the Cities 137–53 (1971) (problems of scope of bargaining in public sector).

**9.** The opinion of the three-judge court upheld a Minnesota fair share statute which provided for agency fees to be paid by all state university professors to the Minnesota Community College Faculty Association. This decision was affirmed by the Supreme Court without opinion. 460 U.S. 1048, 103 S.Ct. 1493, 75 L.Ed.2d 927 (1983). The district court's subsequent injunction modifying the election procedures for faculty representatives was reversed. — U.S. ——, 104 S.Ct. 1058, 79 L.Ed.2d 299 (1984).

ject to advancing those ideas and who are not coerced into doing so against their will by the threat of loss of governmental employment." *Galda v. Bloustein,* 686 F.2d 159, 164 (3d Cir.1982) (emphasis added).

For New Jersey public employees, collective bargaining is inextricably intertwined with legislative change. An examination of the mechanics of New Jersey's public employee collective bargaining agreements reveals the large extent to which the standard terms and conditions of employment under the NLRA or the RLA are governed by state statute or regulation. *Cf. Fibreboard Paper Products v. NLRB,* 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964); R. Gorman, *Basic Text on Labor Law* 496–523 (1976) (review of mandatory subjects of bargaining under NLRA). For example, an affidavit submitted by M. Don Sanchez, the New Jersey Area Director of the CWA, in the *Olsen* proceeding, listed no fewer than fifteen traditional subjects of bargaining that are governed by New Jersey statutes, civil service rules, administrative regulations, or executive orders. Among these are pensions, overtime, subcontracting, employee transfers, safety and health and medical plans. App. at 101–15.[10]

Since many of the essential terms and conditions of employment that are mandatory subjects of bargaining under Sections 8(d) and 9(a) of the NLRA are governed by state authorities in the public employment context, a public employee union unable to lobby the state authority would be severely handicapped in performing its duties as a bargaining representative.

As the Supreme Court noted in *Ellis,*

objecting employees may be compelled to pay their fair share of not only the direct costs of negotiating and administering a collective bargaining contract and of settling grievances and disputes, but also the expenses of activities or undertakings normally or reasonably employed to implement or effectuate the duties of the union as exclusive representative of the employees in the bargaining unit.

104 S.Ct. at 1892. We do not read the legislative history of the New Jersey Act to seek the creation of ineffectual public employee unions, nor do we find any constitutional prohibition against the fulfillment of the legislative goal of promoting labor peace by permitting the enumerated activities of public employee unions.

So long as the lobbying activities are pertinent to the duties of the union as a bargaining representative and are not used to advance the political and ideological positions of the union, lobbying has no different constitutional implication from any other form of union activity that may be financed with representation fees. The district court's contrary conclusion—that the New Jersey Act is facially unconstitutional insofar as it permits lobbying by public employee unions—must therefore be reversed. Under N.J.S.A. 34:13A–5.5, a union is allowed to charge against representation fees the "costs of lobbying activities designed to foster policy goals in collective negotiations and contract administration or to secure for the employees represented advantages in wages, hours, and other conditions of employment in addition to those secured through collective negotiations with the public employer." Without preju-

---

**10.** By way of example, Mr. Sanchez recounts: [O]ne of the fundamental responsibilities of the Union is to protect unit members from arbitrary and capricious disciplinary actions by an employer. Consequently, every collective bargaining agreement that I have helped to negotiate in the private sector contained a disciplinary grievance procedure terminating in binding arbitration. ... However, a Court decision (*State v. Local 195, IFPTE,* 179 N.J.Super. 146, 430 A.2d 966 (App.Div.1981)) declared the imposition of disciplinary sanctions to be non-negotiable and non-arbitrable. ... Shortly after this Court decision was

handed down, legislation was introduced to permit binding arbitration for discipline. ... Given the importance to our unit members of an impartial and independent review of disciplinary action, CWA actively supported [the proposed bill] and related measures, designed to reinstate the right to arbitrate discipline. This support assumed the form of testifying before the Senate Government Committee, speaking with and writing to various legislators, and asking our unit members to support this legislation.
App. at 106–08.

dice to any future challenge to lobbying acts beyond the statutory authorization, we hold that the statute on its face is a legitimate means of achieving the state interest in labor peace and does not unnecessarily burden the First Amendment rights of representation fee payers.

### C.

The recent decision in *Ellis* does not depart from the governing case law developed in the Railway Act trilogy and *Abood*. In *Ellis*, the Supreme Court entertained challenges under the Constitution and the RLA to the use of agency fees to support six categories of union expenditures: conventions, social activities, publications, organizing, litigation, and death benefits. The Court held that, under the RLA, non-consenting agency fee payers could not be charged for organizing expenses or the costs of reporting activities that were themselves not properly taxable against fees. Examining the remaining categories under the Constitution,[11] the Court found no constitutional infirmity to the use of agency fees to support traditional union activities:

> [B]y allowing the union shop at all, we have already countenanced a significant infringement on First Amendment rights.... It has long been held that such interference with First Amendment rights is justified by the governmental interest in industrial peace.... Petitioners may feel that their money is not being well-spent, but that does not mean they have a First Amendment complaint.

104 S.Ct. at 1896.

The Court's discussion of the First Amendment implications of the use of agency fees for publications and conventions is directly apposite to the present case. *Ellis* acknowledges that the use of compelled contributions to finance expressive activity (as is also the case with lobbying) comes closest to the First Amendment protection of communicative content and the free expression of ideas. However, the Court concluded,

> [W]e perceive little additional infringement of First Amendment rights beyond that already accepted, and one that is not justified by the governmental interest behind the union shop itself.... The very nature of the free-rider problem and the governmental interest in overcoming it require that the union have a certain flexibility in its use of compelled funds.... These expenses are well within the acceptable range.

*Id.*

Thus, *Ellis* confirms the basic tenet of the RLA trilogy and *Abood*: the First Amendment is not an insuperable obstacle to the effective representation of a bargaining unit by a union, either in the private or public sectors. Unions advancing the collective interests of the employees they represent need not shoulder the financial burden of non-members simply because effective representation necessarily includes taking positions on the issues affecting the membership. To conclude otherwise would diminish the expressive rights of the majority of employees whose full union contributions would be depleted to cover the costs incurred in the representation of free riders. Such a result is not required by the First Amendment.

### IV.

The second issue pressed on appeal is the constitutionality of the demand and return systems authorized by state statute and implemented by the defendant-unions. The district court's injunction against the operation of the demand and return systems was premised on two distinct constitutional rulings. First, the court held that even optimal demand and return systems violate the First Amendment rights of employees wishing to contribute the withheld monies to alternative political causes of their choosing. Second, the court determined that the procedures for the return of with-

---

**11.** Because the union in question had been decertified during the pendency of the appeal, the Supreme Court did not reach the constitutionality of the use of agency fees for death benefits.

held funds in this situation were unwieldy and burdensome and therefore violated the Fifth Amendment's protection of due process.

### A.

The district court concluded that "no demand and return system can protect an objecting non-member's First Amendment rights." 565 F.Supp. at 946. The locus of the deprivation of First Amendment rights, according to the district judge, is the withholding of funds that the employee might wish to bestow upon an alternative political view and the involuntary loan a non-consenting employee may be forced to grant to a majority bargaining representative. Thus we must determine not whether one or another system of public employee representation is advisable as a matter of public policy—a task uniquely suited to the legislature—but whether the demand and return systems authorized by the New Jersey statute unconstitutionally infringe the First Amendment and due process rights of non-consenting employees.

Turning first to the constitutional significance of the temporary deprivation of funds from an employee's personal political use, we are cautioned by *Abood* that "[a] public employee who believes that a union representing him is urging a course that is unwise as a matter of public policy is not barred from expressing his viewpoint." 431 U.S. at 230, 97 S.Ct. at 797. Where the obstacle to free expression is the temporary deprivation of money, rather than a prohibition of access to a forum, the Supreme Court has allowed far greater leeway to challenged state procedures. In *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), for example, limitations on individual contributions to political campaigns were examined under a lesser standard of scrutiny than restrictions on the expenditures of the political campaign itself. *Buckley* held that ceilings on contributions entail "only a marginal restriction upon the contributor's ability to engage in free communication." *Id.* at 20–21, 96 S.Ct. at 625. Similarly, a temporary loss of

funds does not have the same impact on constitutionally protected speech that the denial of a forum or the forcible contribution to a political cause against one's will would have. *See Lathrop v. Donohue*, 367 U.S. 820, 859, 81 S.Ct. 1826, 1846, 6 L.Ed.2d 1191 (1961) (Harlan, J., concurring) (First Amendment harm remote in context of bar association dues supporting American Bar Association political positions); *Hamilton v. Regents*, 293 U.S. 245, 265, 55 S.Ct. 197, 205, 79 L.Ed. 343 (1934) (First Amendment harm is remote when money is all that is involved). *Cf. Buckley v. Valeo* (compelling governmental interest in fair elections may be furthered by use of matching funds despite some impact of money on First Amendment concerns); *Pruneyard Shopping Center v. Robins*, 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980) (lesser First Amendment concern where state action is content neutral, there is no likelihood of confusion between speaker and state, and an individual is free to disavow statements disagreed with).

Even assuming some cognizable harm occasioned by the temporary deprivation of a small amount of returnable fees exists, adequate post-deprivation procedures may suffice to withstand the constitutional challenge. The district court's final injunctive order is premised on its determination that any remedies after a deprivation of property in violation of the First Amendment right to contribute free of state interference would necessarily be constitutionally inadequate. However, an emerging line of case law has undermined the premise that post-deprivation remedies cannot protect what might otherwise be an unconstitutional taking. In *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), the Supreme Court sanctioned the discontinuation of disability benefits prior to a full evidentiary hearing. The Court reasoned that the notice provisions of the challenged social security termination procedure combined with the "fairness and reliability of the pre-termination procedures," 424 U.S. at 343, 96 S.Ct. at 907, rendered the likelihood of harm remote and the extent of actual harm, were it to occur, *de*

*minimus. See also Board of Curators v. Horowitz,* 435 U.S. 78, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978) (dismissal of medical student prior to full evidentiary hearing permissible); *Dixon v. Love,* 431 U.S. 105, 97 S.Ct. 1723, 52 L.Ed.2d 172 (1977) (summary revocation of drivers license); *Ingraham v. Wright,* 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977) (on-the-spot corporal punishment permissible, even with sole remedy that of state law tort action); *Baksalary v. Smith,* 579 F.Supp. 218, 235 (D.Pa.1984) (Adams, J., concurring) (*Mathews* standard of reliability requires notice and adequacy of post-deprivation procedures).

■ Based upon *Mathews* and its progeny, we conclude that the constitutional infirmity of the demand and return systems, if any, depends on the adequacy of the return arrangements. We hold that, standing alone, the deprivation of the non-consenting employee's ability to contribute the withheld funds to an alternative political view does not constitute a First Amendment violation. Rather, the question is one of the due process protections in the assessment of the withholding and the adequacy of the post-withholding return systems.

### B.

Under *Ellis,* the First Amendment interest of an objecting employee is narrowly defined: no employee may be forced to grant the majority representative "an involuntary loan for purposes to which the employee objects." 104 S.Ct. at 1890. This constitutional interest of an individual employee is not adequately protected by what

the Supreme Court termed "a pure rebate" system, under which the union would have unrestricted use of the objecting employee's funds until such time as repayment is made. It was the absence of any advance reduction, combined with the lack of a compelling state interest in ancillary campus political activities, that occasioned this Court's ruling in *Galda.* In the union context, however, where the Supreme Court has recognized the compelling governmental interest in labor peace, the constitutional issue is the establishment of a system that would protect against the involuntary subsidization of union political and ideological expenditures without unduly burdening legitimate union functioning. Thus, in *Ellis,* the Court approved as satisfying the First Amendment either an advance reduction of dues or the placing of contested funds in an interest-bearing escrow account. 104 S.Ct. at 1890.

The challenged representation fees in the present litigation incorporate both of the protective mechanisms approved by *Ellis.* By statute, there is a fifteen percent differential between the amounts chargeable to fee payers and the union dues of full union members; the ceiling on fees to the former is set at 85 percent of the dues of the latter. In addition, each of the defendant-unions has created an escrow system for a portion of the representation fee. In order for the representation fees collected by the unions to be susceptible to constitutional challenge, therefore, the expenditures for political and ideological activities by them must exceed the sum of the fifteen percent statutory "cushion" and the amount escrowed by the union.[12]

---

**12.** The dissent would read *Ellis* to require that the statute on its face preclude any possibility of forced loans to unions in order to survive constitutional scrutiny. By its own terms, *Ellis* allows for two "acceptable alternatives" that would protect the rights of dissenting employees: an advance reduction of dues and/or interest bearing escrow accounts. 104 S.Ct. at 1890. The statute on its face satisfies one of these two "acceptable alternatives." All representation fee payers are, without request, given a fifteen percent advance reduction from the dues charged to union members. This protection is all that

*Ellis* mandates. Thus there is no occasion in this appeal for this Court to attempt to conjure up an unconstitutional application of the representation fee provision. As the Supreme Court noted in *Ellis,* "[w]hen the constitutionality of a statute is challenged, this Court first ascertains whether the statute can be reasonably construed to avoid the constitutional difficulty." 104 S.Ct. at 1890.

Although the dissent characterizes the challenged New Jersey representation fees as "not substantially different" from those reviewed by the Supreme Court in *Ellis,* the presence of

The district judge concluded that *any* withholding would violate the Constitution and, accordingly, made no findings of fact concerning the protections against unauthorized union expenditures contained within each of the demand and return systems:

Nothing was done after I entered the order in *Robinson* and *Antonacci* either by the defendants in those cases or by the New Jersey legislature to seek to cure or to cure the constitutional defects in the representation fee statute. The union defendants devised and prepared to implement new demand and return systems. The new systems contemplate escrowing a sufficient portion of each objecting non-member's representation fee to ensure that no part of the fee would be spent for political, ideological or improper lobbying purposes prior to exhaustion of the union and state demand and return procedures. The new systems also contemplate the creation of revised union demand and return procedures whereby the unions would be required to establish before outside, independent arbiters the correctness of their fees and the absence of improper expenditures from such fees. Further, the *Robinson* and *Antonacci* union defendants take the position that any objecting non-member may skip the union's demand and return system and proceed directly to the State board of appeals.

These attempts by the *Robinson* and *Antonacci* unions to create effective demand and return systems and the demand and return system established by CWA represent good faith attempts to devise systems which can impartially and accurately determine what portion of a non-member's representation fee is used for contract negotiation, contract administration and processing grievances and what portion is used for other purposes.

Sincere and conscientious as these efforts have been, however, they do not avoid or cure the basic constitutional defects in the New Jersey statute.

565 F.Supp. at 944–45. This determination by the district court is at variance with *Ellis*.[13]

An examination of the demand and return systems adopted by the defendant unions reveals that the principal protections required by *Ellis* and the *Mathews* due process case law are already in existence. The system employed by the NEA locals is automatically triggered by the filing of an objection letter with the local union. The amount immediately escrowed is equal to five per cent over what an independent auditor determines was the amount spent the previous year on non-compulsory representation matters. Arbitration of the disposition of escrowed funds takes place once each year by a member of the National Academy of Arbitrators. The arbitrator determines the amount of dues income expended on collective bargaining (this is computed state-wide for a large union like the NEA and then apportioned to the local—the district court found that this was to the advantage of the employees since the locals were less likely to engage in lobbying or political activity, 547 F.Supp. at 1324). Throughout the entire procedure, the burden of proof rests with the union. All fee payers receive yearly notice of the right to receive a refund.

The AAUP system incorporates many of the features of the NEA arrangement, save that it grants an "advance rebate" equal to a pro rata share for anticipated non-compellable expenses for the remainder of the fiscal year. It also provides for year-end adjustments of the rebate following an auditors report. The AAUP system

both advanced reductions and the escrow system calls this characterization into question.

**13.** The district court's conclusion that "no demand and return system can protect an objecting non-member's First Amendment rights" is in the dissent's view a finding of fact which should be accorded due deference. Although we agree that district court findings of

fact ordinarily are entitled to considerable deference, we read the district court's categorical rejection of all demand and return systems, regardless of advance rebates or interest-bearing escrow provisions, to be a ruling of law and consequently subject to plenary review by this Court.

provides each member at the end of the fiscal year with (1) a financial audit and report for the previous year, (2) the approved budget for the previous year, (3) the budget for the current year, and (4) a statement that all current expenses are within the projected budget. Evidence was introduced that the AAUP engages in no partisan political activity and that less than five per cent of its budget is expended on lobbying or matters not directly related to terms and conditions of employment. Despite the minimal amount spent on potentially objectionable activities, the AAUP has further represented to this Court that its Rutgers University chapter now escrows 100 per cent of the representation fee deducted upon receipt of an objection letter in order to reduce the administrative burdens of the escrow system.

The CWA has formulated the most sophisticated demand and return system of any of the unions involved in these appeals. The national union retains independent auditors to go through the national budget and break down all expenditures into general categories such as organizing, administrative, and lobbying. These categories are then subdivided by category into retainable and non-retainable portions under demand and return systems. This procedure is then repeated at the local level. Upon the filing of an objection letter with the local union, the CWA automatically places into escrow 40 per cent of the agency fee received from a public employee. Since in New Jersey this is based on a representa-

tion fee that is only 85 per cent of the dues paid by a union member, the CWA has access to only 51 per cent of what a union member would pay in the case of each objecting non-union employee. The CWA introduced evidence to show that based upon its elaborate accounting procedures, which were not challenged in the district court, it was ascertained that the New Jersey locals spent between 15.01 per cent and 23.76 per cent of their budgets on arguably non-collective bargaining issues.[14] Thus the "deprivation" suffered by any employee whose funds were escrowed would be between 0.01 per cent and 8.76 per cent of the allowable representation fee. The union also calculated that the monetary value of this "harm" would be between $0.02 and $18.00 per year, per employees, depending on the local involved.

On remand, the district judge should examine these systems to determine whether the escrow procedures satisfy the *Ellis* requirement that the unions not be in a position to extract a forced loan from non-consenting employees.[15]

## V.

The defendant-unions claim that even assuming the district court's ruling on the constitutionality of the lobbying provisions to have been correct, the injunctive relief granted plaintiffs was an abuse of discretion. Although the district court's ruling on the constitutionality of the New Jersey

14. These calculations included all lobbying activity engaged in by the local unions in question. Under our holding in section III of this opinion, much of this lobbying activity, if not all of it, should be computed as a per cent of the annual budget spent on matters related to collective bargaining issues. It would appear that such a recalculation would bring at least some of these locals under the fifteen per cent statutory cushion even without the escrow provision.

15. The district court erroneously enjoined the operation of the agency fee statute until a provision was enacted allowing for a hearing before a state tribunal of any representation fee prior to payment of the fee to the union. 565 F.Supp. at 949. Such an injunction appears to be premised on a heightened eviden-

tiary threshold for the withholding of any funds because of the constitutional impact the trial court found the withholding to have upon non-consenting employees. In *Ellis*, the Supreme Court held that "no heightened standard is appropriate" in judging the propriety of the withheld funds and that there is "no need to abandon the preponderance of the evidence standard normally applicable in civil suits for damages." 104 S.Ct. at 1897 n. 15 (1984) (citing *Addington v. Texas*, 441 U.S. 418, 423, 99 S.Ct. 1804, 1808, 60 L.Ed.2d 323 (1979) (in cases involving a monetary dispute between two private parties, society has a minimal concern with the outcome and, therefore, "plaintiff's burden of proof is a mere preponderance of the evidence")).

statute will be reversed, the propriety of the injunctive relief is nonetheless still before us. We must determine whether it is appropriate to continue the injunctions during the remand to the district court for a determination of the constitutional adequacy of the demand and return systems.

It must be noted that the district court injunctions effectively deprive the unions *in toto* of the statutorily allocated representation fees. Given the small amount of funds lost from any given employee and the costs involved in litigation to recover these lost fees, it is unlikely that any action for recovery will follow. The injunctive relief, therefore, has forced union members to underwrite the lobbying efforts of the union for the terms and conditions of employment of all employees, agency fee payers included. Thus, the effect of the injunctive relief has been to permit the free rider problem which the Supreme Court addressed in *Abood* to manifest itself under the aegis of the court's injunction.

On three separate occasions the Supreme Court has declared that injunctive relief is not the proper judicial response to potential statutory or constitutional violations created by a union's use of mandatory fees. In *Street*, after holding that mandatory union dues could not be used to fund political causes, the Court remanded the case with instructions that "a blanket injunction against all expenditures of funds for the disputed purposes, even one conditioned on cessation of improper purposes, would not be a proper exercise of equitable discretion." 367 U.S. at 772, 81 S.Ct. at 1801. Similarly, in *Allen*, the Court declared that it was impermissible to order "an injunction relieving dissenting employees of all obligation to pay the moneys due ...." 373 U.S. at 119, 83 S.Ct. at 1162.[16] The refusal of the Michigan Court of Appeals to grant injunctive relief was likewise upheld by *Abood*. 431 U.S. at 240–42, 97 S.Ct. at 1802–03.

The case law reflects a fundamental congressional policy against the enjoining of activities of labor unions. Under the Norris-LaGuardia Act, 29 U.S.C. §§ 101–115 (1982), Congress severely limited the availability of temporary or permanent injunctive relief in cases involving or growing out of a labor dispute. *See Street*, 367 U.S. at 772, 81 S.Ct. at 1801. In *Street*, the Court applied the policy concerns of the Norris-LaGuardia Act to suggest that courts "should hesitate to fix upon the injunctive remedy" when many of the challenged expenditures are "made for the purpose of disseminating information as to candidates and programs and publicizing the positions of the union on them." 367 U.S. at 773, 81 S.Ct. at 1802. The Court added, "the fact that these expenditures are made for political activities is an additional reason for reluctance to impose such an injunctive remedy." *Id.*

■ Moreover, the record in these consolidated appeals does not present the factual predicate for the grant of injunctive relief. One of the requirements for an injunction against a state statute is a showing that the continued operation of a statute will result in irreparable harm to the plaintiffs. *See Continental Group, Inc. v. Amoco Chemical Corp.*, 614 F.2d 351, 356 (3d Cir.1980); *Constructors Association of Western Pennsylvania v. Kreps*, 573 F.2d 811, 814–15 (3d Cir.1978). Necessarily, such a showing requires evidence of at least *some* harm. Not only is the record devoid of any proof of actual harm suffered by the plaintiffs here, but the combination of the advanced reduction and the escrow systems adopted by the unions demonstrates the contrary. *See supra* section IV B. Thus while we do not rule out the possibility of an unconstitutional deprivation of non-consenting employees' representation fees in other situations, we must

---

**16.** The Court in *Allen* further cautioned, "no decree would be proper which appeared likely to infringe the union's right to expend uniform exactions under the union-shop agreement in support of activities germane to collective bargaining and, as well, to expend non-dissenters such exactions in support of political activities." 373 U.S. at 122, 83 S.Ct. at 1163.

conclude that the threshold for injunctive relief in this action was not met.

For these reasons we hold that the district court erred in granting broad injunctive relief against the operation of the New Jersey statute and order that the injunctions be lifted forthwith.

## VI.

Half a century ago, the courts of this country confronted the legal issues presented by the National Labor Relations Act and the rise of industrial unionism. From the wellspring that produced the large unions we know today, emerged the various judicial doctrines that by now govern the entirety of the collective bargaining process, from organizing drives to contract negotiations to arbitration of disputes to the rights of individual union members.

In the past half-century, however, the American economy has undergone major changes and these changes have had an impact on both the nature of unions and the issues to be addressed by the law. Not the least of these changes has been the emergence of union activity in the white collar and public employee sectors. While the case law developed through decades of industrial unionism provides a central framework for resolving the concerns posed by newer areas of labor relations, it is not necessarily conclusive. Particularly with respect to public sector employees, the heightened level of state entanglement raises First Amendment and due process problems that were only tangentially implicated in private sector unionism. Our task in this area, then, is to address those new issues in light of the experiences and policies undergirding American labor law.

Because the district court did not properly weigh the important state policies supporting the creation of public employee unions and the minimal impact of the demand and return systems on the First Amendment and due process interests of dissenting employees paying representation fees, its judgment must be vacated.

For the foregoing reasons, the injunctions will be abated and the consolidated cases remanded to the district court for further proceedings consistent with this opinion.

SLOVITER, Circuit Judge, dissenting.

I agree with the majority that lobbying activities that are pertinent to the duties of a public employee union as a bargaining representative and that are not used to advance the political and ideological position of the union may be financed with representation fees. Thus I join parts I, II, and III of the majority opinion. I dissent from the remainder of the opinion that upholds the New Jersey statute notwithstanding the absence of any effective mechanism for insuring that funds collected from unwilling employees will not be used to subsidize activities in support of a union's political and ideological position.

The district court's ruling in this regard was that N.J.S.A. 34:13A–5.5 and 5.6

> violate plaintiffs' constitutional rights in that (i) these statutory provisions permit labor organizations to receive and use plaintiffs' representation fees for political, ideological and impermissible lobbying purposes over plaintiffs' objections, and (ii) the demand and return system purportedly designed to enable plaintiffs to recover the portion of their representation fees used for political, ideological and impermissible lobbying purposes does not avoid or cure the improper use of representation fees because it is extraordinarily cumbersome and places heavy burdens upon a claimant.

*Robinson v. New Jersey*, 565 F.Supp. 942, 944 (D.N.J.1983) (quoting *Robinson v. New Jersey*, 547 F.Supp. 1297, 1321 (D.N.J. 1982)).

I do not view the initial question before us to be whether the protective mechanisms incorporated by the defendant unions are satisfactory. We must reach that issue only if the statute itself can withstand constitutional attack. I agree with the district court that it cannot.

Unlike the majority, I begin with the relevant legal principle enunciated by the

Supreme Court in the most recent case to address the issue, *Ellis v. Railway Clerks*, —— U.S. ——, 104 S.Ct. 1883, 80 L.Ed.2d 428 (1984). There the Court distanced itself from its earlier dictum in *International Association of Machinists v. Street*, 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961) and *Abood v. Detroit Board of Education*, 431 U.S. 209, 238–40, 97 S.Ct. 1782, 1801–02, 52 L.Ed.2d 261 (1977), that might be read as supporting the validity of a rebate program. As the Court in *Ellis* pointed out:

> Those opinions did not, nor did they purport to, pass upon the statutory or constitutional adequacy of the suggested remedies. Doing so now, we hold that the pure rebate approach is inadequate.

104 S.Ct. at 1890 (footnote omitted).

I cannot agree with the majority that the relevant precedent is that of *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), dealing with discontinuation of disability benefits prior to a full evidentiary hearing. Implicated here is the First Amendment, and the substantial right of employees protected by that Amendment not to be forced "to contribute to the support of an ideological cause [they] may oppose". *Abood*, 431 U.S. at 235, 97 S.Ct. at 1799. As the Court stated in *Ellis*, "By exacting and using full dues, then refunding months later the portion that it was not allowed to exact in the first place, the union effectively charges the employees for activities that are outside the scope of the statutory authorization." 104 S.Ct. at 1890. Although the Court was referring to the Railway Labor Act, the Court recognized that the central flaw of a system that permits exaction and then relies upon a subsequent refund is that in practical effect it charges the nonmembers for activities and political positions that may not be charged to them.

In *Abood*, the Court set forth the objective against which the constitutionality of a fee collection arrangement should be measured. It stated: "[T]he objective must be to devise a way of preventing compulsory subsidization of ideological activities by employees who object thereto without restricting the Union's ability to require every employee to contribute to the cost of collective-bargaining activities." 431 U.S. at 237, 97 S.Ct. at 1800. Indeed, Justice Stevens, concurring, stressed that a refund very well might not be adequate. He stated that "the Court's opinion does not foreclose the argument that the Union should not be permitted to exact a service fee from nonmembers without first establishing a procedure which will avoid the risk that their funds will be used, even temporarily, to finance ideological activities unrelated to collective bargaining." *Id.* at 244, 97 S.Ct. at 1804.

When we last considered this issue, Judge Adams, in an opinion which I joined, noted: "A number of courts and commentators appear to agree with the observations by Justice Stevens that a funding system requiring continual payments and subsequent refunds to defendants may not satisfy the requirements of the First Amendment." *Galda v. Bloustein*, 686 F.2d 159, 168 (3d Cir.1982). Justice Stevens' concern about the adequacy of an exaction/refund mechanism seems now to have been accepted by the Court's majority. In *Ellis*, the Court stated, albeit in a statutory analysis:

> The only justification for this union borrowing would be administrative convenience. But there are readily available alternatives, such as advance reduction of dues and/or interest-bearing escrow accounts, that place only the slightest additional burden, if any, on the union. Given the existence of acceptable alternatives, the union cannot be allowed to commit dissenters' funds to improper uses even temporarily.

104 S.Ct. at 1890. Since the Court held that an exaction/refund mechanism was invalid when advance reduction of dues and/or interest-bearing escrow accounts were available as alternatives, I disagree with the majority's approval of a statute that requires use of the exaction/refund mechanism when, as in *Ellis*, advance re-

duction of dues and/or use of an interest-bearing escrow account are also available.

The New Jersey statute contains no provision that realistically insures that nonmember fees are not used for purposes that would impermissibly infringe upon their First Amendment rights. The majority refers to the "protective mechanism" of a 15% differential "between the amounts chargeable to fee payers and the union dues of full union members," since "the ceiling of fees to the former is set at 85 percent of the dues of the latter." *See* Majority Op. at 612. However, I am not persuaded by the majority's suggestion that the statutory fifteen percent differential between union fees and nonunion fee payers satisfies either *Ellis* or the Constitution. Majority Op. at 612–613 n. 12. *Ellis* did not address the elements of a proper "advance reduction" scheme because the case did not require it. I see nothing in the *Ellis* opinion that approves a fixed-percentage reduction that fails to prevent compulsory subsidization of ideological and non-member activities.

The record in this case contains little, if no, evidence that supports the majority's assumption that impermissible uses of the nonmember representation fee will not exceed 15% of the members' dues. In fact, even as to a union that has made extraordinary efforts to meet the constitutional challenge mounted in this case, expenditures did exceed 15%. The New Jersey locals of the Communication Workers of America "were discovered to have spent between 15.01 per cent and 23.76 per cent of their budgets on arguably non-collective bargaining issues." Majority Op. at 614 ; *see* Brief for Appellants CWA in No. 83–5532 at 17; *see also Olsen v. Communication Workers of America*, 559 F.Supp. 754, 760–61 (D.N.J.1983) (non-chargeable expenditures exceeded 15%). Moreover, the evidence in this record pertains only to these few defendant unions whose practices have been subject to extensive scrutiny and revision following filing of this suit. Other unions may spend considerably more than 15% for ideological and political purposes, particularly in an election year, that are

unacceptable to nonmembers. The statute itself contains no provision prohibiting such use in the first instance. As the district court said, "To assume that membership-only expenses and political, ideological and lobbying expenses of each [of the local and national sections of the unions] total 15% or less of pertinent total expenses requires an exercise of faith which should not be required of plaintiffs." *Robinson v. New Jersey*, 547 F.Supp. at 1319.

The only other "protective mechanism" referred to by the majority is the creation by the defendant unions of escrow systems for a portion of the representation fee. Majority Op. at 612. However, most of these escrow systems were created only after they were mandated by the district court. Since the statute itself makes no such requirement, such *post hoc* remedial action by these few unions can hardly cure the facial invalidity of the statute.

Thus, the constitutionality of the statute must depend on the adequacy of the demand and return system contained therein, a system not substantially different than that considered inadequate by the Supreme Court in *Ellis*. Under the New Jersey statutory system, after the union meets its initial burden, which the district court said "can be readily met" by "simple and conclusory statements as to expenditures," the fee payer bears the burden of litigating his or her claim through a long chain of internal and administrative proceedings, during which time the union may continue to use the fees for nonmember and ideological purposes to which the fee payer objects. As the district court described these cumbersome proceedings,

the non-members must then go behind those statements to test not only the propriety of the accounting involved but also the assumptions which were made in allocating expenses to member-only benefits, partisan political activities, and varying kinds of lobbying activities. This the non-members must do before the internal union bodies and then before an administrative law judge. They must proceed before the Appeals Board after the ad-

ministrative law judge makes his findings and recommendations and they are confronted with an appeal to the Appellate Division of the Superior Court of New Jersey and possibly to the New Jersey Supreme Court.

*Robinson v. New Jersey,* 547 F.Supp. 1297, 1318–19 (D.N.J.1982).

The district court had an unusually complete opportunity to examine the operation of these provisions before making its final ruling on the facial invalidity of the statute. Although the court did ultimately categorically reject all demand and return systems it did so only at the conclusion of several years' experience in monitoring the operation of various demand and return options. Therefore, the district court's findings merit considerably more deference than the majority accords them. The district court found,

It has been a useful exercise to examine the CWA demand and return system and the new systems devised by the *Robinson* and *Antonacci* unions after my original opinion in that case. These constituted genuine attempts to create as effective demand and return systems as human ingenuity could devise. Yet each system is complex and overwhelmingly burdensome. Each requires an objecting member to expend such major efforts to pursue his remedy that no individual could be expected to avail himself of the remedy. Thus under the very best demand and return system no objecting non-member can devote the time and money required to ascertain and, if warranted, regain the portion of his representation fee which the union may use for political and ideological purposes. *The statutory requirement of a demand and return system is an illusory remedy.* As a practical matter, therefore, the statute permits a union to take the funds of objecting non-members and use them for the union's own political and ideological purposes. The good faith efforts of the union defendants in these cases to create workable systems demonstrate that no demand and return system can

protect an objecting non-member's First Amendment rights.

565 F.Supp. at 945–46 (emphasis added).

These findings serve as confirmation of the concerns articulated by Justice Stevens in *Abood* and of the judgment of the Supreme Court in *Ellis.* From a practical standpoint, an exaction and return system "effectively charges" the employees for impermissible activities. *Ellis,* 104 S.Ct. at 1890.

The New Jersey legislature can readily enact provisions that would reduce the probability that representation fees from nonmembers will be impermissibly used. It could require an advance determination of the amount of the proposed fee and give notice and a hearing before a state tribunal before payment to the union must be made. Even if such an advance determination could not precisely measure the percentage of expenditures that would be used for purposes that could not be charged to nonmembers, a statutory requirement that the union make some pre-exaction effort to determine the percentage would go a long way toward ameliorating the defects in the exaction/return system established by the New Jersey statute. It would place the burden where it rightfully belongs, on the union that chooses to exact such fees and not on the individual members who are now subject to procedures aptly characterized by the district court as "overwhelmingly burdensome." *Robinson v. New Jersey,* 565 F.2d at 945.

Therefore, I would uphold that portion of the injunction that enjoins the union from receiving representation fees until the statute is amended "so as to include a provision for a hearing before a state tribunal on the validity of any representation fee prior to payment of the fee to the union." 565 F.Supp. at 949.