State of CALIFORNIA, acting by and through the California Department of Transportation; and Sacramento Regional Transit District, Plaintiffs,

v.

UNITED STATES DEPARTMENT OF LABOR; and Thomas E. Perez, in his official capacity as Secretary of Labor, Defendants.

Civ. No. 2:13–cv–2069 KJM DAD.

United States District Court, E.D. California.

Signed Dec. 30, 2014.

Mitchell Neil Reinis, Thompson Coburn LLP, Los Angeles, CA, Stephen B. Higgins, PHV, Thompson Coburn LLP, St. Louis, MO, Kathleen E. Kraft, PHV, Thompson Coburn, LLP, Washington, DC, for Plaintiffs.

Susan Ullman, Govt., U.S. Department of Justice, Ryan Bradley Parker, Govt., Washington, DC, for Defendants.

## ORDER

KIMBERLY J. MUELLER, District Judge.

This case considers the intersection between a state's interest in public pension reform and provisions of the Urban Mass Transportation Act (UMTA) requiring state transit to ensure the preservation and continuation of collective bargaining rights as a condition of receiving federal funding for mass transit projects.

The case was before the court on September 30, 2014 for hearing on defendants' motion to dismiss or for summary judgment, ECF No. 9, plaintiffs' motion for partial summary judgment, ECF No. 54, and defendant's subsequent motion to dismiss plaintiffs' Spending Clause claim. ECF No. 64. Stephen Higgins and Kathleen Kraft appeared for plaintiffs Sacramento Regional Transit District (SacRT)[1] and the California Department of Transportation (CalTrans); Ryan Parker and Susan Ullman appeared for defendants Perez and the Department of Labor (collectively DOL); Jeffrey Freund and Benjamin Lunch appeared for amicus Amalgamated Transit Union (ATU). There was no appearance for amicus Bay Area Rapid Transit (BART). After considering the parties' arguments, the court GRANTS defendants' motion to dismiss plaintiffs' Spending Clause claim, but DENIES its motion to dismiss or for summary judgment of plaintiffs' Administrative Procedures Act (APA) claims. The court GRANTS plaintiffs' motion for summary judgment of their APA claims.

## I. BACKGROUND

Under Section 13(c) of the UMTA, now codified at 49 U.S.C. § 5333(b), state and local governments seeking federal grants for transit assistance must seek certification from the DOL that the "interests of employees affected by the assistance" are protected by "fair and equitable" arrangements. These employee protective arrangements are called 13(c) agreements.

In their complaint, filed October 4, 2013, plaintiffs SacRT and CalTrans challenge DOL's determination that California's enactment of the California Public Employees' Pension Reform Act of 2013 (PEPRA), Cal. Gov't Code § 7522 *et seq.*, prevented 13(c) certification. The complaint raises five claims: (1) DOL's interpretation of PEPRA and Section 13(c) was arbitrary and capricious in violation of the APA; (2) DOL acted in excess of statutory authority in denying 13(c) certification; (3) DOL's refusal to grant 13(c) certification is inconsistent with limits on federal power embodied in the Spending Clause and violates the state's fiscal sovereignty in violation of the Tenth Amendment; (4) DOL prejudged the merits of the issues before it and denied plaintiffs due process in violation of the APA; and (5) a declaratory judgment claim, 28 U.S.C. § 2201. Compl., ECF No. 1 at 15–23.

Defendants filed a motion to dismiss or for summary judgment along with the administrative record on December 9, 2013. Defs.' Mot. for Summ. J., ECF Nos. 9, 9–2, 9–3, 9–4, 9–5.

On January 15, 2014, plaintiffs filed a motion to complete and supplement the administrative record and for limited discovery; on January 26, they filed their opposition to the motion to dismiss. Opp'n, ECF Nos. 18, 21. The court continued the hearing on the motion to dismiss pending the decision on the motion to supplement the record. ECF No. 23.

On April 24, 2014, 2014 WL 1665290, the court granted the motion to supplement in

---

1. DOL refers to SacRT in its documents as SacRTD.

part and denied it in part and gave the parties the opportunity to file supplemental briefs. Order, ECF No. 41.

On May 15, 2014, plaintiffs filed a supplemental brief in opposition to the motion to dismiss and a response to ATU's amicus brief. Pls.' Suppl. Opp'n, ECF No. 43; Response, ECF No. 44. Defendants filed their reply on May 15, 2014.

On June 6, 2014, plaintiffs gave notice of their intent to file a motion for partial summary judgment and on June 30, they filed their motion. ECF Nos. 49, 54.

On July 23, 2014, 2014 WL 3687540, the court granted the motion to dismiss plaintiffs' Spending Clause and declaratory judgment claims, but deferred ruling in light of plaintiffs' pending motion for summary judgment.

In an amended complaint, filed August 5, 2014, plaintiffs SacRT and CalTrans challenge DOL's determination that California's enactment of PEPRA prevented 13(c) certification. The amended complaint raises four claims: (1) DOL's interpretation of PEPRA and Section 13(c) was arbitrary and capricious in violation of the APA; (2) DOL acted in excess of statutory authority in denying 13(c) certification; (3) DOL's refusal to grant 13(c) certification is inconsistent with limits on federal power embodied in the Spending Clause and violates the state's fiscal sovereignty in violation of the Tenth Amendment; and (4) DOL prejudged the merits of the issues before it and denied plaintiffs due process in violation of the APA. Am. Compl., ECF No. 1 at 15–23.

On August 8, 2014, ATU and DOL filed oppositions to plaintiffs' motion for summary judgment. ECF Nos. 60 & 61.

On September 2, 2014, DOL filed a motion to dismiss plaintiffs' spending clause claim. ECF No. 64. Plaintiffs filed their opposition on September 16 and DOL filed its reply on September 23, 2014. ECF Nos. 66, 70.

Plaintiffs filed their replies to DOL's and ATU's oppositions on September 23, 2014. ECF Nos. 71–72.

## II. THE ALLEGATIONS OF THE AMENDED COMPLAINT AND THE ADMINISTRATIVE RECORD

### A. SacRT

SacRT is a special regional transit district formed under California law, Cal. Pub. Util.Code § 102000 *et seq.*, based in Sacramento. ECF No. 59 ¶ 29. SacRT employs approximately 942 people, 492 of whom are represented by ATU, Local Division 256. *Id.* ¶ 41. During the time at issue here, relations between SacRT and ATU were governed by a collective bargaining agreement (CBA), effective September 1, 2009 through February 28, 2013. AR 345. The CBA defines the bargaining unit as "all employees within the service of this DISTRICT in [certain] classifications or occupations" and requires all employees covered by it to become union members as a condition of continued employment. CBA, Art. 1 § 3 & Art. 3 § 1; AR 349, 350.

 Under its statutory authority and through collective bargaining, SacRT has established a pension plan for its unionized employees. ECF No. 59 ¶¶ 42–43. The plan in effect at the relevant time was refined in 2010 to take account of certain changes in the tax laws and was adopted by the SacRT Board of Directors on July 23, 2012. AR 407, 409. This defined benefit plan[2] provides an annual benefit upon

---

2. "A defined benefit plan promises to pay employees, upon retirement, a fixed benefit under a formula. A defined benefit plan consists of a general pool of assets rather than

retirement, based on a percentage of the employee's final average compensation multiplied by years of service. ECF No. 59 ¶ 43; AR 409. The plan is funded exclusively through employer contributions and earnings on plan assets. *Id.; see also* CBA Art. 67 § 2 & Art. 97 § 4 (transit officers); AR 386, 402. "The Plan Document applies to every Member who is credited with an Hour of Service on or after July 1, 2010." AR 409. An "Hour of Service will be credited for each hour for which the Member is paid, or entitled to payment, for the performance of duties for the District as an Eligible Employee subsequent to the Member's most recent date of hire." Plan, Art. 4 § 4.2(a), AR 411. The Plan defines "Date of Hire" as "the date on which an Employee is first entitled to payment for a Hour of Service for the District." Plan, Art. 2 § 2.9, AR 410. A person becomes an "Eligible Employee on the date he or she first (a) becomes an Employee; and (b) is a member of the bargaining unit represented by ATU." Plan, Art. 3 § 3.1, AR 411. An employee is "any person who is employed by the District under a common-law relationship.... A person's status as an Employee will be determined by the District...." Plan, Art. 2 § 2.15, AR 411.

A Plan Member is eligible to retire when he or she is 55 years old and has worked for ten years or has completed 25 years of service. Plan, Art. 7 § 71, AR 413. The retirement payment is calculated using the employee's final compensation, years of service and a percentage multiplier. Plan, Art. 7 § 7.2, AR 413. Pensionable compensation includes overtime, shift differential, bonuses and cashed-out sick leave or vacation. Plan Art. 2 § 2.6, AR 410. A Plan Member who has left employment because of a disability but who returns to service may purchase additional years of service for the time of the disability. Plan, Art. 7 § 7.9, AR 414. The Plan may be modified or amended with the consent of the District and ATU; no such change "may adversely affect any accrued rights of any Member without corresponding advantages, but in all other respects such amendments, alterations, or modifications will be binding upon Members." Plan, Art. 12 § 12.3, AR 416.

In its 418–square mile service area, SacRT operates 69 bus routes with 3,140 bus stops, 38.6 miles of light rail, 50 light rail stations, 33 bus and light right transfer centers, and 18 park-and-ride lots. ECF No. 59 ¶ 40. It "relies heavily on federal funding ... for its capital expenditures." *Id.* ¶¶ 40, 44. For example, in fiscal year 2014, SacRT budgeted $28 million from federal grant funding, or 19.6 percent of its operating budget of $142 million; it cannot replace federal grant

---

individual dedicated accounts. The asset pool may be funded by the employer, employee, or both but the employer typically bears the entire investment risk and must cover any underfunding that might occur as a result of the plan's investments." *Hurlic v. So. Ca. Gas Co.*, 539 F.3d 1024, 1029 (9th Cir. 2008) (citations, internal quotations omitted). There is a second type of pension plan, a defined contribution plan. *Id.* "A defined contribution plan provides for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account. Typically, in a defined contribution plan, the employer contributes a percentage of payroll or profits to participants' accounts, and, at retirement, a participant is entitled to whatever assets are dedicated to his or her individual account, subject to investment gains and losses." *Id.* (citations, internal quotations omitted). "Defined contribution plans dominate the retirement plan scene today," but when ERISA was enacted in 1974 "the [defined benefit] plan was the norm of American pension practice." *LaRue v. DeWolff, Boberg & Assocs., Inc.*, 552 U.S. 248, 255, 128 S.Ct. 1020, 169 L.Ed.2d 847 (2008) (citations, internal quotations omitted, alterations in original).

funds with state or local funds. *Id.* ¶ 45. Without federal funding, SacRT would have been forced to reduce transit services by approximately 38 percent, reduce all levels of maintenance to the minimum required by law, lay off one-third of its staff, and put planned capital improvements on hold indefinitely, which could ultimately put SacRT in default of its contractual obligations to the Federal Transportation Agency (FTA). *Id.* ¶¶ 46–49.

On November 15, 2012, SacRT submitted its fourth application to the FTA for funding of approximately fifty percent of the costs to extend the south corridor, known as the Blue Line, of its light rail system and to construct new stations and a major transit center at Cosumnes River College. SacRT planned to use the funds as reimbursement of capital expenditures made before January 1, 2013. AR 15–52; ECF No. 59 ¶ 52. FTA designated the application as CA–03–0806–03. AR 15; ECF No. 59 ¶ 52.

On December 12, 2012, DOL notified SacRT and its unions of the DOL's intent to certify the pending grant on the basis of the existing 13(c) Agreement unless it received an objection. AR 1–13; ECF No. 59 ¶ 53. The letter did refer to PEPRA and its potential impact on 13(c) protective agreements. AR 1; ECF No. 59 ¶ 54.

ATU timely objected, citing the impact of PEPRA on collective bargaining for pensions and other retirement issues, among other things. AR 211–215; ECF No. 59 ¶ 55. SacRT took issue with ATU's characterization of the impact of PEPRA on collective bargaining. AR 699–702; ECF No. 59 ¶ 56.

In a letter dated January 10, 2013, DOL found ATU's objections to be sufficient and ordered ATU and SacRT to engage in good faith discussions with the aim of finding a mutually acceptable resolution. AR 111; ECF No. 59 ¶ 57. DOL also said it

might not permit interim certification within five days of the end of negotiations because of the "substantial possibility that the parties' failure to negotiate a statutorily sufficient resolution to the issues … may render [SacRT] ineligible for the receipt of federal funds." AR 113; ECF No. 59 ¶ 59.

As the parties were unable to resolve the issues, each filed its final proposal with DOL on February 12, 2013. AR 264–266; ECF No. 59 ¶ 60. ATU proposed that SacRT agree that the pension benefits provided to bargaining unit employees hired after January 1, 2013 be the same as those hired before January 1, 2013 and that SacRT join with ATU in seeking amendment of PEPRA to exempt transit workers from PEPRA. AR 265; ECF No. 1 ¶ 52. SacRT proposed that the parties bargain over the establishment of a new or supplemental defined contribution plan, optional or supplemental retirement benefits for new and existing employees, and pensionable compensation issues. AR 705–706; ECF No. 59 ¶ 61.

On April 18, 2013, DOL declined to issue an interim certification, noting "[t]here may be circumstances inconsistent with [Section 13(c)] based on certain provisions" of PEPRA. DOL directed briefing of the issues. AR 116–118, ECF No. 59 ¶¶ 62–63.

On September 4, 2013, DOL issued its final determination, concluding "the effects of PEPRA render it legally impermissible, under the current circumstances, for the Department to certify fair and equitable employee protective conditions for grants to SacRTD." AR 136. As background to its conclusion, DOL examined PEPRA and a summary of its provisions provided by attorneys from California's Office of the Governor and the Labor and Workforce Development Agency, as well as SacRT's

CBA and Retirement Plan. AR 121. DOL noted that PEPRA has immediate impact on employees hired after January 1, 2013, called "new" employees, because PEPRA controls "the benefit formula ..., the definition of compensation used to determine the pension benefit ("pensionable compensation"), and the minimum age for receipt of a pension; it imposes a cap on the amount of final compensation that can be used in the pension benefit determination, and requires 'new' employees to pay 50 percent of normal pension costs. Additionally, 'new' employees are not eligible to participate in supplemental defined benefit plans." AR 122; Cal. Gov't Code §§ 7522.10 (imposing formulas on pensionable compensation), 7522.18(c) (limiting supplemental defined benefit plans), 7522.20(a) (prescribing formulas for defined benefit plans) 7522.32 (defining final compensation for determining retirement benefits), 7522.34 (restricting pensionable compensation). DOL also observed that beginning January 1, 2018, PEPRA "authorizes employers to set 'classic employees' contribution level at 50 percent of the normal cost of pension benefits after bargaining to impasse...." AR 122 (defining classic employees as those who do not meet the definition of "new").

DOL began its analysis by noting that "[a]nalyzing the parties' claims requires consideration" of *Jackson Transit Authority v. ATU, Local Division 1285,* 457 U.S. 15, 102 S.Ct. 2202, 72 L.Ed.2d 639 (1982) and *Amalgamated Transit Union v. Donovan,* 767 F.2d 939 (D.C.Cir.1985). AR 31–32. DOL's interpretation of 13(c) as a "mandate to continue collective bargaining rights" flowed from its understanding of these two cases as well as from the legislative history of the UMTA and its own *Manager's Handbook: Guidance For Addressing Section 13(c) Issues.* AR 126–128. DOL stated, "[t]here is nothing in *Donovan* or the language of section 13(c)

that permits the Department to certify a transit grant if a change in state law substantially reduces existing benefits and significantly limits the scope of bargaining over them.... [B]ecause SacRTD and its represented transit employees had the ability to bargain over the full panoply of pension rights, the process of collective bargaining with respect to those terms must continue in order for the Department to certify." AR 129.

DOL rejected SacRT's claim that state law controlled the issues, saying that *Donovan* was the controlling case and, under *Donovan,* "[f]ederal labor policy, rather than state law, defines the substantive meaning of the collective bargaining rights that must be continued for purposes of section 13(c)." AR 130. Relying on this understanding, DOL concluded that "[w]here a state statute forecloses negotiation between management and labor over mandatory subjects of collective bargaining, the Secretary cannot certify." *Id.*

DOL also was not convinced by SacRT's argument that the PEPRA changes affecting only new employees had no impact on certification: "there is no applicable distinction between 'new' and 'classic' employees for purposes of sections 13(c)(1) and (2)." AR 131. It reasoned that these two subdivisions "protect the collective rights to all bargaining unit members, not individual rights. Under well-established federal labor policy, '[u]nlike a standard commercial contract, a collective bargaining agreement binds both those members within a bargaining unit at the time the agreement is reached as well as those who later enter the unit'" and so "a collective bargaining agreement is applicable to all bargaining unit members, regardless of their date of hire. As a result, the Secretary cannot certify a grant sought by a transit agency if the transit agency unilaterally reduces the negotiated benefits of

any bargaining unit employees, regardless of their date of hire, or precludes the union from negotiating over benefits and contributions for employees hired during the term of the collective bargaining agreement." AR 131–132 (quoting *Gvozdenovic v. United Air Lines,* 933 F.2d 1100, 1106–07 (2d Cir.1991)).

### B. CalTrans

CalTrans is an executive department within the state of California, with headquarters in Sacramento. ECF No. 59 ¶ 28. Under California Government Code section 14030, CalTrans has the authority to assist local transit agencies in the development and operation of mass transit and the application for and use of federal funds. *Id.* ¶ 35. It ensures the availability of funds for public transit programs by serving as the direct recipient of federal funds under a number of FTA funding programs. *Id.* ¶ 36.

In its assistance role, CalTrans sought FTA funds for Monterey–Salinas Transit's (MST) Mobility Management Project, submitting an application on September 20, 2013; this was denominated CA–90–Z117–00. AR 141–145; ECF No. 59 ¶ 37. DOL denied this application on September 30, 2013, incorporating its denial of MST's earlier grant application. AR 138–139; ECF No. 59 ¶ 71 & Ex. B at 50–51.

MST was created as the "consolidated transportation services agency for [Monterey] county." Cal. Pub. Util.Code § 106012. It is able to hire its own staff or contract with any public agency or agency of the United States to provide services. *Id.* § 106040. At least some of MST's workers are represented by ATU, which timely objected to 13(c) certification, citing the impact of PEPRA on collective bargaining. AR 773–776, 823 (CBA from October 1, 2010 through September 30, 2013). MST participates in a miscellaneous plan[3] administered by CalPERS and under its CBA, MST "shall make sufficient contributions to maintain the benefits provided under the pre-existing PERS contract during the life of this Agreement." CBA, Art. 14, AR 824, 833. For employees hired before June 30, 2011, "MST shall fund the full employee share of PERS actuarial contributions," but for employees hired after that date, "MST shall fund 50% of PERS actuarial contributions and the employee shall fund 50%." AR 824. Under the PERS provisions, the normal age of retirement for miscellaneous members is 55 and retirees receive two percent of final compensation multiplied by years of service. AR 829. The MST plan also provides for the purchase of "airtime" and permits the use of bonuses, overtime, pay for additional services and unused leave as pensionable compensation. AR 195.

On December 26, 2012, and January 28, 2013, MST applied directly to FTA for a separate grant to update its trolley system; this was ultimately assigned the number CA–03–0823. AR 158–165, 172–179. On December 31, 2012, DOL notified MST and its unions of its intent to certify the grant if there were no objections. AR 147–150. On January 15, 2013, ATU filed objections. AR 180. On February 5, 2013, DOL found ATU's objections sufficient and directed it to engage in good faith negotiations with MST. AR 180–183. DOL noted it did not anticipate issuing an interim certification at the end of negotiations **"due to the substantial possibility that the parties' failure to negotiate a statutorily sufficient resolution to the issues in this matter may render MST**

---

**3.** A miscellaneous plan is one offered to state employees not involved in law enforcement, fire suppression, or other such categories. AR 194 n. 7.

ineligible for the receipt of Federal funds." AR 182 (emphasis in original).

Despite negotiations, the parties were unable to resolve the questions about the impact of PEPRA. AR 783. ATU's position was that "[u]nless modified through collective bargaining, ATU Local 1125 and MST agree that the same pension benefits provided to ATU-represented employees hired after January .1, 2013, will be the same as those hired before January 1, 2013, so that the current terms and conditions of the pension plan will remain unchanged for all employees represented by Local 1225." AR 783. MST responded it "cannot agree to ignore the legal mandate imposed by PEPRA," and offered to negotiate alternate retirement benefits, among other things. AR 904.

On August 15, 2013, DOL asked the parties to submit briefs addressing a number of questions. AR 185–186.

On September 30, 2013, DOL issued its final determination. As it did with SacRT's application, DOL concluded that "PEPRA makes significant changes to pension benefits that are inconsistent with section 13(c)(1)'s mandate to preserve pension benefits under existing collective bargaining agreements and section 13(c)(2)'s mandate to ensure continuation of collective bargaining rights. Thus, PEPRA precludes the Department from providing the requisite certification of the Federal Transit Authority." AR 191 (footnote omitted). As in the SacRT decision, DOL began with an examination of the pertinent case law, the legislative history and its *Manager's Handbook*, saying that "[u]nder the standard in *Jackson Transit* and *Donovan*, the Department is legally obligated to deny certification where collective bargaining rights have neither been preserved nor continued." AR (footnote omitted). As it did in the SacRT decision, it relied on *Donovan*'s prescription of "[f]ederal labor

policy" to guide its determination and relied on cases decided under the National Labor Relations Act (NLRA) to conclude that PEPRA's effect on "new" employees prevented 13(c) certification because a CBA binds even those who later enter the bargaining unit. AR 201. "As a result, the Secretary cannot certify a grant sought by a transit agency if the transit agency unilaterally reduces the negotiated benefits of any bargaining unit employees, regardless of their date of hire, or precludes the union from negotiating over benefits or contributions for employees hired during the term of the collective bargaining agreement." AR 203. DOL also said that "[t]he availability of collective bargaining over other aspects of pension benefits does not cure the fundamental conflict between PEPRA and section 13(c), namely, that PEPRA removes from the scope of collective bargaining many key aspects of pensions." AR 202 at n. 18. It said it could not issue the certification for funding because " 'new' employees will have to pay more to fund their pensions and work longer to achieve the same benefit they would have been entitled to before PEPRA. 'Classic' employees will be restricted in the range of benefits and will not be able to bargain for benefits they previously enjoyed and will not be able to purchase airtime and, as of 2018, will likely have to pay more for their benefits." AR 205. DOL again said that section 13(c)(1) and (c)(2) protect the collective bargaining rights of all transit employees covered by collective bargaining, not individual rights. "No applicable distinction between 'new' and 'classic' employees exists for purposes of these sections." AR 205–206.

## III. THE APA CLAIMS

### A. Summary Judgment Under the APA

■ A court considering a challenge to agency action under the APA "sits as an

appellate tribunal," *Bioscience, Inc. v. Thompson,* 269 F.3d 1077, 1083 (D.C.Cir. 2001), and "the complaint, properly read, actually presents no factual allegations, but rather only arguments about the legal conclusion[s] to be drawn about the agency action." *Marshall Cnty. Health Care Auth. v. Shalala,* 988 F.2d 1221, 1226 (D.C.Cir.1993).

▪ Because the APA requires the court to review the whole record or those parts of it cited by a party, the court does not determine whether there are disputed issues of material fact, as it would in a typical summary judgment proceeding. *Occidental Eng'g Co. v. Immigration and Naturalization Serv.,* 753 F.2d 766, 769 (9th Cir.1985) (stating court's function is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did); *see also South Yuba River Citizens League v. Nat'l Marine Fisheries Serv.,* 723 F.Supp.2d 1247, 1256 (E.D.Cal. 2010) (stating usual summary judgment standards do not apply).

### B. Standard of Review

▪ Under the APA,

[t]o the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

. . .

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

5 U.S.C. § 706.

The parties agree that the claims in this case require this court to consider whether DOL properly interpreted and applied 13(c), but dispute the level of deference this court must apply to that determination. Pls.' Mot. for Summ. J., ECF No. 54–1 at 7; Defs.' Mot. For Summ. J., ECF No. 9–1 at 12; Pls.' Opp'n to Defs.' Mot., ECF No. 21 at 8; Defs.' Opp'n to Pls.' Mot., ECF No. 61 at 8. To identify the proper level of deference, the court looks beyond the language of the APA itself. DOL argues the court must review the determination under the extremely deferential standard established by *Chevron v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Plaintiffs first argue that DOL's interpretation and application of 13(c) is a question of law subject to *de novo* review, and then says that even if some deference is appropriate, DOL's interpretation is not entitled to *Chevron* deference but rather a lesser degree of deference.

▪ In *Chevron,* the Supreme Court considered a challenge to regulations issued by the Environmental Protection Agency defining several terms. The Court said that when it "reviews an agency's construction of the statute which it administers, it is confronted with two questions."

467 U.S. at 842, 104 S.Ct. 2778. The first is whether Congress has directly addressed the question. *Id.* at 843, 104 S.Ct. 2778. If not, the second question is whether the agency's construction of the statute is permissible. *Id.* In considering the second question, a court examines whether "Congress has explicitly left a gap for the agency to fill," because such a gap "is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation." *Id.* at 843–44, 104 S.Ct. 2778. Regulations adopted to fill a gap "are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 844, 104 S.Ct. 2778. Deference under *Chevron* is appropriate when Congress has entrusted an agency with a particular expertise to fill this policy gap. *Id.* at 843–44, 104 S.Ct. 2778 (stating deference is appropriate "whenever the meaning or reach of a statute has involved reconciling conflicting policies, and a full understanding of the force of the statutory policy in the given situation has depended upon more than ordinary knowledge respecting the matters subjected to agency regulations") (citations & internal quotation marks omitted).

Plaintiffs point to *United States v. Mead Corporation,* a case in which the Supreme Court held that "administrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." 533 U.S. 218, 226–27, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001); *see also Marmolejo–Campos v. Holder,* 558 F.3d 903, 908–09 (9th Cir.2009) (en banc) ("[B]efore we apply *Chevron,* we must conclude that Congress delegated authority to the agency to interpret the statute in question and that the agency decision under review was

made with a lawmaking pretense.") (internal quotation marks omitted). In *Marmolejo–Campos,* the Ninth Circuit went on to say an agency's interpretations of statutes made "in the course of adjudicating cases" might be subject to *Chevron* deference if the agency's orders bind third-parties and are thus precedential, but unpublished decisions are not because they do not bind future parties. 558 F.3d at 909. The court found the lesser *Skidmore* deference applicable "when an agency with rulemaking power interprets its governing statute without invoking such authority." *Id.* (citing *Skidmore v. Swift & Co.,* 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944)).

As noted, plaintiffs argue that the questions raised by the motions in this case are questions of law, subject to *de novo* review. In *Securities & Exchange Commission v. Chenery,* the Supreme Court said when an agency's action is "a determination based upon judge-made rules," it cannot be upheld "if the agency has misconceived the law." 318 U.S. 80, 93–94, 63 S.Ct. 454, 87 L.Ed. 626 (1943); *see also Aurora Packing Co. v. N.L.R.B.,* 904 F.2d 73, 75–76 (D.C.Cir.1990) (*Chevron* deference did not apply to NLRB determination whether worker was an employee or independent contractor "because of the ... congressional direction that the Board and the courts apply the common law of agency to the issue").

There are few decisions reviewing section 13(c) certifications that clearly identify a standard of review. In *City of Macon v. Marshall,* the district court declined to "review[ ] or 'second guess[ ]' " DOL's determination about the "fair and equitable arrangements that will protect the interests of employees," based on its conclusion that section 13(c) commits this type of agency action to the "Secretary of Labor's discretion." 439 F.Supp. 1209, 1223 (M.D.Ga.1977). In *Kendler v. Wirtz,* the

Third Circuit affirmed a district court's dismissal of an action by transit employees seeking to enjoin DOL from certifying that fair and equitable arrangements had been made to protect employee interests. 388 F.2d 381, 382 (3d Cir.1968). The court in *Kendler* found "the scope of permissible review" to be limited, noting that "[a] mere difference of judgment between a person disadvantageously affected by agency action and the responsible head of the agency . . . is not judicially reviewable." *Id.* at 383.

Then there is the District of Columbia Court of Appeals' decision in *Donovan.* In deciding it could review the issues before it, that court distinguished both *City of Macon* and *Kendler* and gave scant recognition to *Chevron,* relying on the latter case only to reject any claim that a certification decision was unreviewable. 767 F.2d at 945 n. 7 (stating that neither case "speak[s] to the present situation, where the Secretary has determined that an agreement that does not satisfy all of section 13(c)'s objectives is nevertheless fair and reasonable. In essence, this case does not concern the exercise of recognized discretionary authority, but an agency's interpretation of the authority delegated to it. Such interpretations are always subject to judicial review."). The court rejected DOL's certification only after undertaking its own examination and interpretation of Section 13(c) and specifying how DOL should interpret such agreements. *Donovan* thus supports plaintiffs' claim that *de novo* review is appropriate.

The nature of the challenged decisions here also supports *de novo* review. Rather than conducting an essentially discretionary review of whether any arrangement could be fair and equitable in light of PEPRA or relying on any administrative expertise, DOL relied on case law and federal labor policy, as filtered through a number of NLRA cases, to reject the applications at issue.

To the extent the DOL did rely on its expertise rather than on an interpretation of case law, the court rejects *Chevron* deference. Even though DOL has issued administrative guidelines for issuing its 13(c) certifications, the statute does not give the agency rulemaking authority, *City of Colorado Springs v. Solis,* 589 F.3d 1121, 1129–30 (10th Cir.2009), and DOL's guidelines are procedural rather than substantive. *See* 29 C.F.R. § 215.1 ("The purpose of these guidelines is to provide information concerning the Department of Labor's administrative procedures in processing applications for assistance under the Federal Transit law. . . ."). Moreover, the letters at issue in this case were not published and so lack precedential effect. *Marmolejo–Campos,* 558 F.3d at 908–09. As in *Mead Corporation,* these factors show that the agency was not using its expertise to fill a gap left by Congress. *Chevron* deference is not appropriate. *Mead Corp.,* 533 U.S. at 231–32, 121 S.Ct. 2164. In this case, *Skidmore* deference at most controls. *Id.* at 234–35, 121 S.Ct. 2164. Even when a decision is entitled to *Chevron* or *Skidmore* deference, it may still be arbitrary and capricious. *See Atrium Med. Ctr. v. U.S. Dep't of Health & Human Servs.,* 766 F.3d 560, 567 (6th Cir.2014) (citing *Allentown Mack Sales & Serv., Inc. v. NLRB,* 522 U.S. 359, 374, 118 S.Ct. 818, 139 L.Ed.2d 797 (1998) (stating the process by which an agency reaches its decision must be logical and rational)); *see also Fox v. Clinton,* 684 F.3d 67 (D.C.Cir.2012) (finding agency letter's "persuasive power" under *Skidmore* was "virtually nil" and the agency's decision was arbitrary and capricious "for want of reasoned decision-making").

■ In determining whether an agency's decision was arbitrary and capricious, the court must consider

if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (applying the standard to agency rule making); *Judulang v. Holder,* —— U.S. ——, 132 S.Ct. 476, 484, 181 L.Ed.2d 449 (2011) (stating that arbitrary and capricious review ensures agencies have engaged in reasoned decision-making); *Arent v. Shalala,* 70 F.3d 610, 615 (D.C.Cir.1995) (applying arbitrary and capricious review when the issue was whether the discharge of the agency's authority to define substantial compliance with labeling guidelines was reasonable; discussing interplay of 5 U.S.C. § 706(2)(A) and *Chevron*).

In this case, to the extent the DOL's decisions are purely legal interpretations, the court considers them *de novo.* If there is any deference to be accorded to the letters, it is under the lesser *Skidmore* standard. To the extent the DOL's letters are entitled to deference, the court thus undertakes *Skidmore* analysis, but when reviewing whether the DOL engaged in reasoned decision-making, the court considers whether the decision was arbitrary and capricious.

## C. California's Public Employees' Pension Reform Act of 2013 ("PEPRA")

In 2012, California's Governor signed the PEPRA into law "to reform California's public employee pension systems and to bring the staggering cost of funding such systems under fiscal control." ECF No. 59 ¶ 6. Under PEPRA, employees hired after January 1, 2013 ("new" employees) must contribute at least 50 percent of the normal costs of their defined benefit plan, and PEPRA establishes a cap on the amount of compensation that can be used to calculate a retirement benefit for new and "classic" employees. *See* Cal. Gov't Code §§ 7522.30(a), 7522.10(c), 20683.2. The law ends the ability of public employees to purchase nonqualified service time, or "airtime," toward their pensions, with no further applications for such credit accepted after January 1, 2013. *Id.* § 7522.46. In addition, it implements a two percent at age 62 defined benefit for all new non-safety employees and uses the highest average annual compensation over a three-year period as final compensation for pension calculations, excluding bonuses, unplanned overtime and unused vacation or sick leave from this calculation. *Id.* §§ 522.32(a), 7522.34. *See* AR 1319–1323 ("What Does PEPRA Do?").

## D. The Urban Mass Transportation Act of 1964 ("UMTA")

UMTA was enacted to further "the interest of the United States ... to foster the development and revitalization of public transportation systems ..." 49 U.S.C. § 5301(a). The purposes of the Act are to "provide funding to support public transportation" and "promote the development of the public transportation workforce," among other things. 49 U.S.C. § 5301(b)(1), (8); *see Kramer v. New Castle Area Transit Auth.,* 677 F.2d 308, 310 (3d Cir.1982) (UMTA was force behind "[t]he whole move away from private transit systems and into public systems" by providing "the financial support to allow the changeover to public transportation companies").

Section 13(c) of UMTA provides in pertinent part:

(b) Employee protective arrangements.—(1) As a condition of financial assistance ... the interests of employees affected by the assistance shall be protected under arrangements the Secretary of Labor concludes are fair and equitable. The agreement granting the assistance ... shall specify the arrangements.

(2) Arrangements under this subsection shall include provisions that may be necessary for—

(A) the preservation of rights, privileges, and benefits (including continuation of pension rights and benefits) under existing collective bargaining agreements or otherwise;

(B) the continuation of collective bargaining rights....

49 U.S.C. § 5333(b)(1), (2)(A) & (B).

Here again, there is little case law interpreting Section 13(c) in the context of federal review of funding applications against a backdrop of potential conflicts between federal and state law. *See In the Matter of NJ Transit Bus Operations, Inc.,* 125 N.J. 41, 592 A.2d 547, 559 (Sup.Ct. of N.J.1991) ("With the possible exception of the *Donovan* opinion, however, there is virtually no guidance from the case law, legislative history, or documented action by the Department of Labor (DOL) to aid determining precisely at what point conflicts between state law and section 13(c) will result in the DOL's discretionary or mandatory decertification and defunding of a state transit system.").

In the early 1980s, some cases considered whether Section 13(c) gave rise to a federal cause of action. In *Jackson Transit,* the Supreme Court considered whether Section 13(c) "by itself" converted a claimed breach of a collective bargaining agreement into a federal cause of action. 457 U.S. at 17, 21, 102 S.Ct. 2202. In the course of answering the question, the Court noted that a

"consistent theme" in the legislative history [of the UMTA] was that "Congress made it absolutely clear that it did not intend to create a body of federal law applicable to labor relations between local government entities and transit workers. Section 13(c) would not supersede state law, it would leave intact the exclusion of local government employers from the National Labor Relations Act, and state courts would retain jurisdiction to determine the application of state policy to local government transit labor relations.

*Id.* at 27, 102 S.Ct. 2202 (footnote omitted). The Court added, "Congress designed § 13(c) as a means to accommodate state law to collective bargaining, not as a means to substitute federal law of collective bargaining for state labor law." *Id.* at 28, 102 S.Ct. 2202.

A year before *Jackson Transit,* the First Circuit considered similar issues in a suit filed by a union, arguing that its 13(c) agreement rendered Massachusetts law governing collective bargaining unconstitutional. *Local Division 589, Amalgamated Transit Union v. Massachusetts,* 666 F.2d 618 (1st Cir.1981). As in *Jackson Transit,* the appellate court framed the issue as "whether Congress intended § 13(c), or, to be more specific, whether it intended assurances made pursuant to § 13(c) to override conflicting state law." *Id.* at 627. The court concluded that "the specific detailed assurances given by a union and a transit authority to the Labor Department under (UMTA) § 13(c) do not invalidate a state law to the contrary." *Id.* at 636. It characterized the legislative history as providing "a limited set of provisional protections.... To erect upon § 13(c) assurances a near permanent set of specific collective bargaining conditions which the state can-

not change is to go beyond its limited purpose." *Id.* at 634. It noted that the "threat of receiving no further UMTA funds" will often prevent a state from changing its laws, so there was no need to have UMTA override state law. 666 F.2d at 634

On this point, both parties rely on the D.C. Circuit's decision in *Donovan,* as did the DOL in both rulings at issue here. ECF No. 9–1 at 14; ECF No. 54 at 13. As noted, *Donovan* was an APA challenge to the Secretary of Labor's certification of a 13(c) agreement that did not did not permit collective bargaining on five subjects previously subject to bargaining. 767 F.2d at 943. The court, in a 1985 decision, rejected the Secretary's argument that he could find an agreement fair and equitable overall, saying that UMTA "prescribes statutory minima that both circumscribe his discretion and dictate standards for determining the fairness and equity of particular labor protective arrangements." *Id.* at 944. The court acknowledged *Jackson Transit* and *Local 589,* agreeing that "labor protective agreements are to be the product of local laws and local bargaining," but concluded "section 13(c) governs a state's right to federal funding." *Id.* at 944. It continued that "[s]tates are free to forego such assistance and thus to adopt any collective bargaining scheme they desire. . . . But the statute does not allow states to eliminate collective bargaining rights and still enjoy federal aid." *Id.* at 947.

The court in *Donovan* then turned to defining "what 'the continuation of collective bargaining rights' requires." It examined the legislative history, which it believed showed that Congress intended "to measure state labor laws against the standards of collective bargaining established by labor policy," even though it "did not intend to subject local government employers to the precise strictures of the NLRA." *Id.* at 948–49. The court said that "Congress used the phrase ["collective bargaining"] generically, incorporating the commonly understood meaning of collective bargaining . . . [which] was universally understood to require at a minimum good faith negotiations, to a point of impasse if necessary, over wages, hours and other terms and conditions of employment." *Id.* at 949 (emphasis in original). It concluded that "[c]ollective bargaining does not exist if an employer retains the power to establish wages, hours, and other conditions of employment without the consent of the union or without at least first bargaining in good faith to impasse over disputed mandatory subjects." *Id.* at 951.

Finally, the court said "section 13(c)'s requirement that collective bargaining rights be continued does not in any way dictate the substantive provisions of a collective bargaining agreement. . . . Section 13(c) does not perpetuate the *substantive* terms of pre-acquisition bargaining agreements, but rather protects the *process* of collective bargaining. The substantive provisions of collective bargaining agreements may change, but section 13(c) requires that the changes be brought about through collective bargaining, not by state fiat."[4] *Id.* at 953 (emphases in original).

---

4. In a later case, the Court of Appeals for the D.C. Circuit quoted this passage and said "[w]e are not sure what to make of this passage. The ICC relies upon and quotes only the first two sentences, while the RLEA and the UTU argue persuasively that they are made largely irrelevant by the last sentence.

Given this state of internal conflict, we do not undertake to say what is the teaching of *Donovan* relevant to the present case." *Railway Labor Execs. Ass'n v. United States,* 987 F.2d 806, 814 n. 3 (D.C.Cir.1993) (interpreting a now-repealed provision with the same language as Section 13(c)).

### E. Claim One—The Continuation of Collective Bargaining Rights

■ Defendants argue that under *Donovan*, the union's reduced ability to bargain for pension benefits, which are traditional subjects of collective bargaining, means that the continuation of collective bargaining has been undercut. ECF No. 9–1 at 13–15; ECF No. 61 at 11–15.

Plaintiffs counter that *Donovan* cannot be read as holding that any diminution in the ability to bargain means that the continuation of collective bargaining has been destroyed. ECF No. 21 at 13–14. They cite to an analysis from the General Counsel of California's Labor and Workforce Development Agency analyzing PEPRA's changes, which says that PEPRA permits collective bargaining over pensions, but rather simply changes the way employers may offer defined benefits; they argue DOL should have relied on this analysis in reaching its decision. *Id.* (citing *Urban Mass Transportation Act of 1963: Hearings on H.R. 3881 Before the H. Comm. on Banking & Currency*, 88 Cong. 486 (1963)). Plaintiffs also argue that the DOL's decision here is contrary to its certification of a Massachusetts plan after Massachusetts had enacted changes to public employee pension benefits similar to PEPRA, particularly because DOL essentially adopted Massachusetts' analysis of the bill, while rejecting California's analysis of PEPRA. ECF No. 21 at 11–14; ECF No. 54 at 10–18.[5]

In reply, defendants note that DOL discussed and distinguished the Massachusetts case and argue its decision is not arbitrary and capricious.

Relying on *Jackson Transit* and *Local 589* plaintiffs argue in essence that state law determines the scope of negotiations about pension benefits but then does not restrict the parties from bargaining in good faith within that defined space. Defendants argue, to the contrary, that under federal labor law, every aspect of pensions must be open to bargaining for the "continuation of collective bargaining" to be satisfied.

Plaintiffs read *Jackson Transit* and *Local 589* too broadly. Neither case considered the interplay between state law and 13(c) certification. In *Local 589*, the court recognized that "§ 13(c) assurances need not override state law to make § 13(c) enforceable. The threat of receiving no further UMTA funds would often prevent a state currently receiving those funds from changing its laws contrary to the policy of § 13(c)." 666 F.2d at 634. The issue in *Jackson Transit* was "whether § 13(c) by itself permits a union to sue in federal court for alleged violations of an arrangement of this kind or of the collective-bargaining agreement between the union and the local government transit authority." 457 U.S. at 16, 102 S.Ct. 2202. The Court continued that although 13(c) "specifies five different varieties of protective provisions that must be included among the § 13(c) arrangements; and it expressly incorporates the protective arrangements into the grant contract between the recipient and the Federal Government," it is "a means to accommodate state law to collective bargaining, not a means to substitute a federal law of collective bargaining for state labor law." *Id.* at 23–24, 28, 102 S.Ct. 2202 (footnote omitted). Although both cases recognize the primacy of state law over collective bargaining, their determination that Section

---

**5.** In an amicus brief, Bay Area Rapid Transit (BART) argues it was able to bargain with its employees over a number of pension-related matters. ECF No. 26–1. At the hearing on the motion, however, plaintiffs acknowledged that information about BART's bargaining experience was not before DOL when it rejected the grant applications at issue.

13(c) does not impose conditions on state labor law outside of the certification process does not squarely answer the questions presented in this case. Neither case interpreted Section 13(c) in the context of an application for funding. See *Stockton Metro. Transit Dist. v. Div. 276 of the Amalgamated Transit Union*, 132 Cal. App.3d 203, 212, 183 Cal.Rptr. 24 (1982) (UMTA "does not squarely attempt to directly displace states' powers in the area of mass transit, rather it merely provides for certain conditions to the receipt of federal aid to which a state or local government must agree"). This case, in contrast, considers the relationship between local governments and the federal government in the funding application context.

Defendants argue that the restrictions on collective bargaining imposed by PEPRA run afoul of *Donovan*. Plaintiffs argue that *Donovan* is not controlling in this respect; the statute in that case considered eliminated bargaining rights on a number of topics, whereas in this case, PEPRA impacts but does not foreclose collective bargaining over pensions.

The court in *Donovan* considered a series of amendments to the statutes establishing the Metropolitan Atlanta Rapid Transit Authority (MARTA) that "prohibited MARTA from bargaining over five subjects that are at issue here" and changed the procedures for interest arbitration. 767 F.2d at 941, 943. The Secretary of Labor nevertheless issued a Section 13(c) certification and the union brought an APA action, challenging the fairness of an agreement "that did not permit collective bargaining on five subjects over which the union was previously entitled to bargain." *Id.* at 943.

The *Donovan* court recognized that "Section 13(c) does not prescribe mandatory labor standards for the states, but rather dictates the terms of federal mass tran-

sit assistance.... [T]he statute does not allow the states to eliminate collective bargaining rights and still enjoy federal aid." *Id.* at 947. It then turned to "what 'the continuation of collective bargaining rights' requires," and concluded that "federal labor policy" rather than state law informed the inquiry. *Id.* at 948. The court recognized that this federal labor policy was not established by the NLRA, because "Congress neither imposed upon the states the precise definition of 'collective bargaining' established by the NLRA, nor did it employ a term of art devoid of meaning, leaving the states free to interpret and define it as they saw fit. Instead, Congress used the phrase generically, incorporating within the statute the commonly understood meaning of 'collective bargaining.'" *Id.* at 949. The *Donovan* court defined that meaning as "'[g]ood faith bargaining, to a point of impasse if necessary, over wages, hours and other terms and conditions of employment [which is] the essence of federally-defined collective bargaining rights; indeed.. it is the almost universally recognized definition of collective bargaining in the United States." *Id.* at 950–51. Under this definition, "[c]ollective bargaining does not exist if an employer retains the power to establish wages, hours and other conditions of employment without the consent of the union or without at least first bargaining in good faith to impasse over disputed mandatory subjects." *Id.*

Plaintiffs read too much into *Donovan* to argue that it means 13(c) certification should be withheld only when statutory changes completely preclude collective bargaining. But defendants also read too much into the case when they say it controls the interpretation of Section 13(c) in this case.

In *Donovan*, the state had amended laws specifically applicable to MARTA,

"prohibit[ing] MARTA from bargaining over five subjects," *id.* at 943, and giving MARTA "unilateral control" over a number subjects. *Id.* at 952. The statute was thus designed to change the balance of power in one particular labor relationship.

In this case, the statute before the DOL did not give one party control over collective bargaining but rather made across-the-board changes in public employee pension law: PEPRA changes the parameters within which collective bargaining may proceed but does not give unilateral authority to SacRT or MST. In issuing its denial letters, DOL relied on *Donovan* reflexively, without properly distinguishing its factual context. Moreover, DOL ignored the fact that even under federal labor policy, "[b]oth employers and employees come to the bargaining table with rights under state law that form a 'backdrop' for their negotiations." *Fort Halifax Packing Co., Inc. v. Coyne,* 482 U.S. 1, 21, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987). Part of this backdrop may be pension reform, because there is nothing in federal labor policy "which expressly forecloses all state regulatory power with respect to those issues, such as pension plans, that may be the subject of collective bargaining." *Malone v. White Motor Corp.,* 435 U.S. 497, 504–05, 508, 98 S.Ct. 1185, 55 L.Ed.2d 443 (1978) (under now superseded Disclosure Act, no "distinction between collectively bargained and all other plans … with regard to … the regulatory functions that would remain with the States"); *see also Metro. Life Ins. Co. v. Mass.,* 471 U.S. 724, 756, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985) ("[f]ederal labor law … is interstitial, supplementing state law where compatible, and supplanting it only when it prevents the purposes" of federal law); AR 447, Unified Protective Agreement, Pursuant to Section 5333(b) (Jan. 3, 2011) at 2 ("All rights, privileges, and benefits (including pension rights and benefits) of employees covered by this arrangement … under existing collective bargaining agreements or otherwise …, shall be preserved and continued; provided, however, that such rights, privileges and benefits which are not foreclosed from further bargaining under applicable law or contract may be modified by collective bargaining and agreement by the Recipient and the Union involved to substitute other rights, privileges and benefits."). DOL thus erred in its interpretation of the intersection between federal labor policy and a state's system-wide changes in some aspects of public employment.

Moreover, by finding that PEPRA prevents collective bargaining over pensions, DOL essentially determined that a pension is necessarily a defined benefit plan and found that PEPRA's restrictions on such plans means that collective bargaining on these issues could not be continued. As plaintiffs observe, nothing in PEPRA prevents bargaining over defined contribution plans, which are another form of pension. DOL's determination essentially writes a substantive term into labor-management agreements, outside of DOL's authority to do so.

Finally, DOL failed to consider the realities of public sector bargaining:

> Public employee bargaining is distinctive in that at least a portion of the union's attention is directed away from the bargaining table, even for what would be designated the standard terms and conditions of employment under the NLRA:

> "[I]n the private sector, the employer must send someone to the bargaining table with authority to make a binding agreement. In the public sector this may not be legally possible or politically sensible. Wages and other benefits directly affect budget and the tax rates; but adopting budgets and levying taxes

are considered, within our governmental system, fundamental legislative polices to be decided by a legislative body, not by a negotiator at the bargaining table.... Modifications in state pension plans cannot, in most states, be made binding by negotiators, but must be ratified by the legislature. In the public sector, agreement at the bargaining table may be only an intermediate, not a final, step in the decisionmaking process."

*Robinson v. State of New Jersey,* 741 F.2d 598, 607 (3d Cir.1984) (quoting Summers, Public Sector Bargaining: Problems of Governmental Decisionmaking, 44 U. Cinn. L.Rev. 669, 670–71 (1975)). DOL's failure to consider the realities of the process of public sector bargaining renders its decision arbitrary and capricious; *see also Skidmore,* 323 U.S. at 140, 65 S.Ct. 161 (stating deference depends in part on the "thoroughness evident" in the department's consideration). In light of this determination, the court does not reach plaintiffs' argument that DOL failed to distinguish its own prior decisions regarding pension reform in Massachusetts and Section 13(c) certification. Plaintiffs' motion for summary judgment is granted as to claim one.

### F. Claim Two—Preservation of Collective Bargaining

■ Defendants say that based on PEPRA's undisputed changes to pension contribution formulas for "new" employees, hired after January 1, 2013, DOL properly concluded that PEPRA did not preserve existing collective bargaining rights. ECF Nos. 9–1 at 17–19 & 61 at 15–18.

Plaintiffs argue that DOL acted in excess of its authority when it rejected state law defining when a public employee becomes entitled to pension benefits and say that employees hired after PEPRA's effec-

tive date have no rights to other pension formulas to be preserved. ECF No. 54–1 at 22–24; ECF No. 21 at 15–16.

In reply, defendants do not dispute the points about the vesting of pensions under California law, but argue this is not relevant because DOL is tasked with interpreting the federal law on the preservation of rights in existing collective bargaining agreements.

Defendants do cite cases suggesting, at least under the NLRA, mandatory collective bargaining includes wages for unrepresented, non-union members; they argue that the bargaining unit for a CBA includes employees not yet hired. *See, e.g., Wood v. Nat'l Basketball Ass'n,* 602 F.Supp. 525, 529 (S.D.N.Y.1984) (rejecting plaintiff's argument that he was not bound by a CBA because "he was not an NBA player when the union and owners reached agreement on the issues in contention here"); *but see Merk v. Jewel Co., Inc.,* 848 F.2d 761, 764 (7th Cir.1988) (stating that employees hired in the future "by definition are not yet members of the bargaining unit").

DOL relied on *Wood* and other cases, but failed to consider whether the snippets it excerpted from case law were sufficiently analogous to the situation before it. The DOL cited *Gvozdenovic v. United Airlines, Inc.* for the proposition that "a collective bargaining agreement binds both those members within a bargaining unit at the time the agreement is reached as well as those who later enter the unit." 933 F.2d 1100, 1106–07 (2d Cir.1991). In the case, the plaintiffs sought to vacate an arbitration award, arguing they were not bound by the CBA's arbitration provisions because they had not been employed by United Airlines at the time the agreement was reached. *Id.* In *Wood,* the plaintiff sought to negotiate a different employ-

ment contract with the NBA, a contract in conflict with the CBA. 602 F.Supp. at 529. In *J.I. Case v. N.L.R.B.*, the employer sought to avoid negotiating with the union, relying instead on individual contracts with its employees. 321 U.S. 332, 64 S.Ct. 576, 88 L.Ed. 762 (1944). The Supreme Court said that "individual contracts obtained as the result of an unfair labor practice may not be the basis of advantage to the violator of the [NLRA] nor of disadvantage to the employees." *Id.* at 336, 64 S.Ct. 576. In *Wood* and *Gvozdenovic,* in other words, employees attempted to avoid provisions of the CBA they believed affected them unfairly; in *J.I., Case,* it was the employer who did so. *See also Melanson v. United Air Lines, Inc.,* 931 F.2d 558, 561 (9th Cir.1991) ("Allowing an employee or employer, by virtue of an individual agreement, to establish an employment status different from that of other employees would undermine the efficacy of collective bargaining. The effect on the federal labor scheme of allowing individual agreements that conflict with the CBA would be the same whether the agreement is reached prior to or during a formal employment relationship."); *Clarett v. Nat'l Football League,* 369 F.3d 124, 139 (2d Cir.2004) ("[A]n NFL club would commit an unfair labor practice were it to bargain with Clarett individually without the union's consent.").

In this case, neither "new" employees nor the employers are pursuing individual agreements or are seeking some advantage outside the CBA, but rather are constrained by PEPRA as a backdrop to their employment relationship. DOL misapplied federal labor policy in relying on the cases it did to evaluate PEPRA's impact on the preservation of collective bargaining rights. By finding as-yet-not-hired employees covered by a CBA, DOL arrogated to itself the authority to define a bargaining unit, an authority it does not have.

SacRT's CBA, which was in the administrative record before the DOL, defines the bargaining unit as employees in SacRT's service. An employee cannot be "in service" before he or she has started work. *See* Oxford American Dictionary Online (defining "service" as "[t]he action of helping or doing work for someone"). The portion of MST's CBA defining the bargaining unit does not appear to be in the administrative record, yet DOL apparently assumed that its understanding of a bargaining unit comported with the definition in that document. AR 203; *see Stanford Hosp. & Clinics v. NLRB,* 370 F.3d 1210, 1213 (D.C.Cir.2004) (rejecting the NLRB's order adding employees to a bargaining unit because "the representation clause of the CBA clearly exclude[d]" the employees).

In rejecting certification based on its evaluation of PEPRA's impact on new employees, DOL misinterpreted the law and did not consider all relevant factors. Plaintiffs' motion for summary judgment on this claim also is granted.

### G. Claim Three—Prejudging the Merits

In light of the resolution of the other claims, the motion to dismiss claim three is denied as moot.

## IV. THE SPENDING CLAUSE

### A. Allegations of the Amended Complaint

California's public transit network and operations would not be self-sustaining without federal funds. ECF No. 59 ¶ 33. In fiscal year 2013, the available federal transit funding for California totaled nearly $2 billion; California's total spending on transit for that period was approximately $8.5 billion. ECF No. 59 ¶ 33.

On August 1, 2013, the Secretary of Labor wrote to California's Governor, informing him that absent immediate legislation, $1.6 billion in federal transit grants to California agencies, amounting to almost 80 percent of federal transit funds for which California was eligible, would be withheld because PEPRA prevented compliance with Section 13(c). ECF No. 59 ¶ 10. In addition to the two denials at issue in this case, on September 30, 2013, DOL issued final determinations of pending FTA grants for the Santa Clara Valley Transportation Authority, Monterey–Salinas Transit, the Alameda–Contra Costa Transit District, the Golden Gate Bridge, Highway Transportation District on essentially similar grounds. ECF No. 59 ¶ 26.

On September 11, 2013, the California Legislature passed Assembly Bill 1222, which provides a temporary exemption of transit workers' pension plans from PEPRA to allow critical work on affected projects to continue pending resolution of the transit agencies' challenge to the DOL's actions. ECF No. 59 ¶ 15. The Governor signed the bill on October 4, 2013. *Id.* The exemption expires on either the date of a judicial ruling that the DOL erred in its determination regarding PEPRA and Section 13(c) or on January 1, 2015, whichever is earlier. ECF No. 59 ¶ 16. Plaintiffs allege the DOL thus coerced California into exempting transit workers from PEPRA, impairing the state's fiscal and legislative sovereignty. ECF No. 59 ¶ 25.

### B. Standard for a Motion to Dismiss

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a party may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." A court may dismiss "based on the lack of cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pa-*

*cifica Police Dep't,* 901 F.2d 696, 699 (9th Cir.1990).

Although a complaint need contain only "a short and plain statement of the claim showing that the pleader is entitled to relief," FED. R. CIV. P. 8(a)(2), in order to survive a motion to dismiss this short and plain statement "must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). A complaint must include something more than "an unadorned, the-defendant-unlawfully-harmed-me accusation" or "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'" *Id.* (quoting *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955). Determining whether a complaint will survive a motion to dismiss for failure to state a claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679, 129 S.Ct. 1937. Ultimately, the inquiry focuses on the interplay between the factual allegations of the complaint and the dispositive issues of law in the action. *See Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).

In making this context-specific evaluation, this court must construe the complaint in the light most favorable to the plaintiff and accept as true the factual allegations of the complaint. *Erickson v. Pardus,* 551 U.S. 89, 93–94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007). This rule does not apply to "'a legal conclusion couched as a factual allegation,'" *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986) quoted in *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955, nor to "allegations that contradict matters properly subject to judicial notice" or to mate-

rial attached to or incorporated by reference into the complaint. *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988–89 (9th Cir.2001). A court's consideration of documents attached to a complaint or incorporated by reference or matter of judicial notice will not convert a motion to dismiss into a motion for summary judgment. *United States v. Ritchie*, 342 F.3d 903, 907–08 (9th Cir.2003); *Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir.1995); *see Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002) (noting that even though court may look beyond pleadings on motion to dismiss, generally court is limited to face of the complaint on 12(b)(6) motion).

## C. The Spending Clause

■ "The Spending Clause of the Federal Constitution grants Congress the power '[t]o lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, —— U.S. ——, 133 S.Ct. 2321, 2327, 186 L.Ed.2d 398 (2013) (quoting U.S. Const., Art. I, § 8, Cl. 1). Although the federal government's authority is broad, the Spending Clause does impose limits:

> First, the exercise of the spending power must be in the pursuit of the general welfare. Second, the conditions on receipt of federal funds must be reasonably related to the articulated goal. Third, Congress' intent to condition funds on a particular action must be authoritative and unambiguous, "enabl[ing] the States to exercise their choice knowingly, cognizant of the consequences of their participation." Fourth, the federal legislation may be invalid if an independent constitutional provision bars Congressional actions. The independent constitutional bar rule "stands for the unexceptionable proposition that the power may not be used to induce the States to engage in activities that would themselves be unconstitutional.

*Nevada v. Skinner*, 884 F.2d 445, 447 (9th Cir.1989) (citations omitted). In *South Dakota v. Dole*, the Supreme Court suggested another limit on spending authority: "in some circumstances the financial inducement offered by Congress might be so coercive as to pass the point at which 'pressure turns into compulsion.'" 483 U.S. 203, 211, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987) (quoting *Steward Mach. Co. v. Davis*, 301 U.S. 548, 590, 57 S.Ct. 883, 81 L.Ed. 1279 (1937)). In *Dole*, the Court found that Congress's conditioning of the receipt of highway funds on South Dakota's raising its drinking age to 21 did not reach the point of compulsion when the penalty for refusing would be the loss of only 5 percent of highway grant funds. *Id.* at 211, 107 S.Ct. 2793.

In *Skinner*, the Ninth Circuit questioned the viability of the coercion theory, noting it "has been much discussed but infrequently applied in federal case law and never in favor of the challenging party"; the Circuit suggested this result has flowed from the "elusiveness" of the theory. 884 F.2d at 448; *see also Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 493 (4th Cir.2005) ("Although there might be a federal funding condition that is unconstitutionally coercive, neither the Supreme Court nor any federal court of appeals has yet identified one.").

Recently, however, the Supreme Court has upheld a Spending Clause challenge to the Medicaid expansion portion of the Affordable Care Act. In *National Federation of Independent Business v. Sebelius (NFIB)*, the Court found the federal government's financial inducement was coer-

cive when Congress threatened to withhold Medicaid funding, in light of the fact that Medicaid spending "accounts for over 20 percent of the average State's total budget." —— U.S. ——, 132 S.Ct. 2566, 2604, 183 L.Ed.2d 450 (2012). It contrasted the " 'relatively mild encouragement' " in Dole to the threatened loss of all of a state's Medicaid funding, which it described as "a gun to the head." *Id.* (quoting *Dole,* 483 U.S. at 211, 107 S.Ct. 2793). The Court continued:

> It is easy to see how the *Dole* Court could conclude that the threatened loss of less than half of one percent of South Dakota's budget left that State with a 'prerogative' to reject Congress's desired policy, "not merely in theory but in fact." The threatened loss of over 10 percent of a State's overall budget, in contrast, is economic dragooning that leaves the States with no real option but to acquiesce in the Medicaid expansion.

*NFIB,* 132 S.Ct. at 2604–05 (citation omitted).

 Defendants argue plaintiffs' amended claim must be dismissed because it "contains a basic use restriction" and so is not coercive. Mot. to Dismiss, ECF No. 64–1 at 11. They also argue plaintiffs plead the impact on the transit budget rather than on the state's budget as a whole and so do not satisfy any pleading minimum.

Plaintiffs argue the provision here is not a basic use restriction because it conditions the receipt of money for transit on a separate goal of protection of collective bargaining rights. They also argue there is no formula for evaluating the coercive nature of the conditions.

Although the complaint alleges some coercive impact in pleading that the Legislature enacted and the Governor signed legislation to exempt transit workers from PEPRA, it does not set forth the impact on the state's budget as a whole. Although there may be no precise formula that applies, the court has not found and plaintiffs have not cited a case evaluating the impact on the budget of a state agency alone rather than on the state's budget as a whole. The motion to dismiss is granted in this respect.

IT IS THEREFORE ORDERED that:

1. Defendants' motion to dismiss the Spending Clause claim, ECF No. 64, is granted without leave to amend.

2. Defendant's motion to dismiss or for summary judgment on the APA claims, ECF No. 9–1, is denied;

3. Plaintiffs' motion for summary judgment on the APA claims, ECF No. 54, is granted; and

4. This matter is remanded to the Department of Labor for further proceedings consistent with this order.